M. BERENSON CO., INC., et al., Plaintiffs,

v.

FANEUIL HALL MARKETPLACE, INC. and Faneuil Gallery, Inc., Defendants.

Civ. A. No. 83–1944–WF.

United States District Court, D. Massachusetts.

June 1, 1987.

Erik Lund, Posternak, Blankstein & Lund, Boston, Mass., for plaintiffs.

William P. Stimson, Sullivan & Worcester, Boston, Mass., for defendants.

## OPINION

WOLF, District Judge.

We are here today to conduct the hearing with regard to the fairness of the proposed settlement of this class action. There is a considerable amount that was done in preparation for this hearing. When the complicated settlement was initially proposed for circulation to class members in October 1986, and a request that that be done expeditiously was made, I nevertheless required the parties to provide substantial briefing with regard to the possible merit of the settlement in order to satisfy myself that it justified circulation to the class. In addition, I held a hearing on that issue. I also appointed Mr. Harrington as an expert witness and to serve as *amicus curiae* with regard to issues relating to the reasonableness of attorneys' fees.

In addition, I requested and received from the parties very detailed proposed findings of fact and conclusions of law which I've had an opportunity to study before this hearing. The hearing has afforded me the opportunity to raise with the parties the questions in my mind. I now believe that I have all the information that's necessary to make an informed decision. In view of the fact that there is urgency from the parties' perspective to getting this matter concluded and in view of the fact that I am as fully informed as I will ever be on this subject, I feel that I can appropriately decide this case now and inform you of my decision.

As I indicated earlier, I will deliver this opinion orally. I reserve the right to read the transcript and correct any inaccuracies. I also reserve the right, which I expect to exercise, to footnote the transcript to cause the opinion to refer to the relevant legal authorities.

In addition, I reserve the right, which I may or may not exercise, to supplement the transcript with a written opinion, supplementary opinion, if that seems necessary or appropriate.

To eliminate any avoidable suspense, I will tell you at the outset that I have determined that the proposed settlement is fair and reasonable and adequate for all class members and will approve it for reasons I'll describe in a moment pursuant to Federal Rule of Civil Procedure 23(e).

By way of background, I note that this is a class action of past and present tenants of Faneuil Hall Marketplace against Faneuil Hall Marketplace, Inc., and Faneuil Gallery, Inc.

Count 1 of the complaint, which I will call the fraud claim, alleges that the defendants defrauded the plaintiffs by causing them to make certain payments to the defendants that were purportedly in lieu of real estate taxes but which actually had no fair or reasonable relationship to the tax-related payments the defendants made to the City of Boston. Count 2 of the complaint, which I will call the common area maintenance cost claim, alleges that the defendants overcharged tenants for the cost of maintaining the common area of the marketplace. Count 3 of the complaint, which I will call the heating, and air-conditioning, cost claim, alleges that the defendants breached the standard heating and the air-conditioning provision of its leases to the plaintiffs.

In their complaint, plaintiffs seek reimbursement for wrongfully proposed charges, an injunction restraining defendants for retaliating against plaintiffs for

participation in this lawsuit, double or treble of damages, attorneys' fees, and costs.

The defendants deny the material allegations of the complaint and also presented a detailed rebuttal of those claims. In some cases they have alleged counterclaims.

After the initiation of this action, the parties engaged in vigorous, disputed discovery relating to the request for class certification. The request for class certification was vigorously challenged by the defendants.

On January 5, 1984, Judge John McNaught, to whom this case was originally assigned, certified this as a class action by the plaintiff class consisting of all present and former retail tenants of Fanueil Hall Marketplace and Fanueil Gallery who in their leases or subleases have one or more of three standard clauses requiring the leasee to pay a proportionate share of either real estate taxes, common facilities operating and maintenance costs, and/or heating or air-conditioning system operating costs. After class certification discovery on the merits continued; that too was disputed.

In addition, the parties disputed the proper form of notice to the class which had been certified. No notice informing class members of certification of class was sent prior to the proposed settlement which was ultimately agreed to.

In May 1985, settlement discussions began. In June 1985, this case was randomly reassigned to me when I became a member of this court. The parties in 1985 continued their settlement discussions. At all times those settlement discussions were conducted at arm's length, without collusion, between energetic and able counsel, each of whom was vigorously representing his respective client. Those settlement discussions included discussions of whether the defendants would pay plaintiffs' legal fees as part of the settlement.

In January 1986 the parties agreed in principle to a proposed settlement for the plaintiff class. As part of that agreement, the defendants agreed in principle to pay plaintiffs' attorneys' fees in an amount to be determined by the Court. Subsequent-

ly, the Faneuil Hall Tenants' Association representing present tenants approved the proposed settlement by the margin of 56 to 4, with 8 abstentions.

Counsel for the parties embarked on preparing documents, to submit to the Court, for circulation to the parties relating to the proposed settlement. They also had continued negotiations regarding the means of determining the amount of attorneys' fees that the defendants would be obliged to pay in connection with the settlement.

In September 1986, it was agreed that the defendants would pay plaintiffs' attorneys' fees in an amount of $500,000, and up to $20,000 in out-of-pocket expenses incurred by the plaintiffs and their attorneys. The amount of attorneys' fees was negotiated after and independent of the agreement with regard to the settlement for the class plaintiffs.

In October 1986, the parties submitted to the Court a proposed settlement for circulation to the plaintiff class and asked for an expeditious mailing and decision relating to the proposed settlement. The request to the Court was made by submission of a settlement agreement that was executed by all of the named plaintiffs. Some were former tenants, some were present tenants. The Court met with counsel for the parties on short notice and heard their request that the proposed settlement be distributed promptly. The Court, however, took certain steps to preliminarily evaluate the possible fairness of the proposed settlement. This took some time. In connection with this, the Court required that the parties file a lengthy joint memorandum in support of their joint motion for the entry of a scheduling order.

In addition, the Court held a hearing on January 23, 1987, regarding the possible fairness of the proposed settlement. As a result of that effort, the Court required certain changes in the notice to members of the class. These included, but were not limited to, the following: the notice disclosed this Judge's prior partnership in the firm of Sullivan & Worcester and invited class members to express any objection

they might have to this Court's participation in this case. As that notice reflected, I had withdrawn as a partner of Sullivan & Worcester 18 months before this action began. I have not been affiliated with that firm since 1981.

In addition, I required changes in the notice reflected on Pages 9 and 10 of the final notice emphasizing that the proposed settlement would have different value to different segments of the class, and that past and present tenants would be treated differently. In addition, the notice indicated that some present tenants would, as a result of a proposed settlement if it were approved, end up paying more for heating, ventilation, and air-conditioning charges then they now pay.

I also required that the parties in the notice specifically ask for expressions of any disagreement with the Court's tentative view that any plaintiff who opted out of the proposed class, the actual class, could prosecute its claim in an independent action. That is reflected on Page 17 of the notice.

Finally for these purposes, as reflected in the notice, I appointed John M. Harrington, from the firm of Ropes & Gray, to serve as an expert witness and as *amicus curiae* to advise the Court as to the applicable law for determining the reasonableness of the $500,000 attorneys' fees to which the parties had agreed, and to testify on the relevant facts as he found them, and to render an opinion on the reasonableness of the fees agreed to. At that point, I was satisfied that the proposed the settlement merited consideration by the class as a possible fair settlement. Notice of this hearing today and voluminous documents describing settlement were sent to all plaintiffs. Each was offered a chance to object to the settlement, and then be excluded from the class if his objections were not satisfied by this Court's action in response to them.

In addition, each class member was also offered the opportunity to opt out of the class immediately since no prior notice of class certification had been sent. As was noted earlier, each member of the class was also expressly invited to inform the Court if it was his view that it is not practical to prosecute his individual claims in an independent action.

No objections to the proposed settlement have been filed. None have been expressed at this hearing. Three plaintiffs have informed the Court of their desire to opt out of the class and will be allowed to do so. They are Rocco Zuccarelli, Crate & Barrel, Inc., and San Rio, Inc. No one has indicated that he, or any other plaintiff, cannot prosecute their claim in an independent action; that is, neither the three parties who opted out nor anyone else expressed this view. The Court finds that each plaintiff member of the class has a claim that can legally and practically be litigated separate from this class action.

Prior to this hearing, I received Mr. Harrington's report regarding the relevant law, the facts as they appear to him from his investigation, and his opinion that the amount of fees and expenses agreed to by the parties is within the range of reason.

We have conducted this hearing concerning the fairness of post settlement. No objections have been expressed. I did have a number of questions, which the parties have addressed.

■ As I indicated earlier, I now have all of the information necessary in my view to rendering an informed decision. In this case I am called upon to determine whether the proposed settlement to the class action is fair, reasonable and adequate to all of the members of the plaintiff class. Where, as here, a proposed class settlement has been reached after meaningful discovery, after arm's length negotiation, conducted by capable counsel, it is presumptively fair.[1]

■ Nevertheless, there is a series of factors which I have felt obliged to consider and have considered in determining that this proposed settlement is fair and reasonable and adequate. Those factors include but are not limited to the following. I have

---

1. Manual for Complex Litigation, Second, § 30.41 at 237.

considered plaintiffs' likelihood of succeeding on the merits of each of these claims, each of their claims at trial, and the likelihood of their recovering damages on those claims.[2] I have considered the amount of the settlement compared to the amount at issue in the case.[3] I have considered whether the major causes of action in the complaint are addressed in the settlement.[4] I have considered whether segments of the class are treated differently in the settlement and to the extent that they are, the reasonableness of this different treatment.[5] I have considered whether the named plaintiffs benefit more or differently than the rest of the class.[6] I've considered the adequacy of the representation of all of the plaintiffs.[7] I have considered the state of discovery. I have considered whether the settlement negotiations were at arm's length and without collusion.[8] I have considered whether the amount of attorneys' fees was negotiated after and separate from the amount of the proposed settlement for the members of the class.[9] I've considered class counsels' recommendations.[10] I have considered the fact there are no objections, and the number of exclusions are limited since the number of objections and the number of requested exclusions are relevant factors.[11] I would have considered the nature and merit of any objections if objections had been raised.

I have explained the applicable legal principles relevant to my decision that the settlement of this case is fair, reasonable, and adequate to all members of the plaintiff class. I will now explain the conclusions of

law that I have derived from applying those principles to the facts as I have found them.

First, I find that it is uncertain whether the plaintiffs would prevail at trial on any or all of their claims. With regard to Count 1, the fraud claim, for example, there are significant questions raised as to whether the defendants made what were, in effect, prepayments of some of the required payments in lieu of taxes. In addition, there is also a litigable question concerning whether the plaintiffs knew of the alleged deception at the time of the *Real Paper* article discussed in the parties' papers and either were not deceived or had knowledge that would commence the applicable period for the statute-of-limitations at a relatively early date. The corollary of this is the fact that there is a significant question as to whether the deception claim would be barred in whole or in part by the statute of limitations.

With regard to Count 2, the parties present a competitive question concerning the interpretation of the standard lease agreement as it should be applied to the space occupied by the so-called Bull Markets.

With regard to Count 3, there is a significant issue as to whether, if the plaintiffs prevail, they would achieve only a reallocation of the heating, ventilation, and air-conditioning costs among them, rather than a net gain for the plaintiffs as a whole.

2. *Malchman v. Davis*, 761 F.2d 893, 900 (2d Cir.1985); *Walsh v. Great Atlantic and Pacific Tea Co.*, 726 F.2d 956, 965 (3rd Cir.1983).

3. *In re Traffic Executive Association–Eastern Railroads*, 627 F.2d 631, 633 (2d Cir.1980); *Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173, 1178 (9th Cir.1977).

4. Manual for Complex Litigation, Second, § 30.-41 at 237.

5. *Id.*

6. *Id.*

7. *Weinberger v. Kendrick*, 698 F.2d 61, 74 (2d Cir.1982); *Reed v. General Motors*, 703 F.2d 170, 175 (5th Cir.1983).

8. *Weinberger*, 698 F.2d at 74.

9. Manual for Complex Litigation, Second, § 30.-41 at 237.

10. *Holmes v. Continental Can Co.*, 706 F.2d 1144, 1149–50 (11th Cir.1983); *Pettway v. American Cast Iron Pipe Co.*, 576 F.2d 1157, 1215 (5th Cir.1978), *cert. denied*, 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979).

11. *Ohio Public Interest Campaign v. Fisher Foods, Inc.*, 546 F.Supp. 1, 11 (N.D.Ohio 1982); *In re Art Materials Antitrust Litigation*, 100 F.R.D. 367, 372 (D.Ohio 1983); *See also* 7B Wright & Miller, *Federal Practice and Procedure*, § 1797.1 at 410–11.

There are also other serious litigable issues presented including the efficacy of a fairly large number of releases obtained by the defendants. In addition, it is uncertain what the plaintiffs would recover if they were to prevail at trial on any or all of their claims.

With regard to the amount of the settlement, I find that although it is hard to value it precisely now, the amount of the settlement is substantial. The parties seem to agree that it is worth at least several million dollars to the plaintiffs. This would be a reasonable amount, even if the plaintiffs' claim that they are seeking more than $5 million is accepted.

In addition, I find that all the major causes of action stated in the complaint are addressed in the settlement. Furthermore, discovery in this case prior to the agreed settlement was substantial. That has furnished class counsel, the parties, and now the Court the means to make an informed decisions with regard to the settlement.

I also find that class counsel is skilled, experienced, and vigorous in its representation of the plaintiff class.

In addition, I find that the negotiation of the settlement has at all times been conducted at arm's length without collusion between the parties or counsel for the parties. Particularly, as I noted earlier, the amount of attorneys' fees ultimately agreed upon were negotiated after and separate from the agreement on the amount the plaintiff class would receive in this settlement. There was no conflict of interest between attorneys for the class and members of the class in this case. In general, I find that the representation of the class was adequate. Moreover, when the class counsel recommended the settlement, the present tenants overwhelmingly voted for it. In addition, the named plaintiffs, some of whom are present tenants and some of whom are past tenants, all ask the Court to approve the settlement. After full disclosure to all class members of the relative benefits to different segments of the class was given, no objections to the settlement were filed.

In addition, it is a significant feature of this case, which does not ordinarily obtain, that because no prior notice of the class certification had been issued in this case, the class members who did not find the settlement attractive could elect to opt out of the settlement. Three did so. Their claims can be prosecuted in independent actions.

Moreover, the Court finds consistent with the decision of *In re Four Seasons Security Laws Litigation*,[12] that any prospective class member who received the class notice and failed to request exclusion from the class has judged retrospectively for himself that his interests have been adequately represented in the negotiation of the proposed settlement agreement.

I also find that the named plaintiffs as a group will not benefit from the proposed settlement in a manner which differs from the plaintiff class as a group.

As I indicated earlier, the named plaintiffs include both former tenants and present tenants. Among the present tenants, with regard to reallocation of heating, ventilation, and air-conditioning costs, some of the named plaintiffs will benefit. The others will be required to pay more than they otherwise would.

I find that, as the notice has fully disclosed, there are segments of the class which are treated differently from each other. I further find, however, that this is reasonable. The settlement creates two classes of former tenants, called the 1976 class and the '80 class or 1980 class. There is also a third segment consisting of present tenants. I find that the division of the plaintiff class set out in the agreement into class '76 tenants, class '80 tenants, and present tenants was reasonable and appropriate, and fairly reflects the reality of the business situation presented by this lawsuit.

---

12. *In re Four Seasons Securities Laws Litigation*, 502 F.2d 834, 843 (10th Cir.), *cert. denied*, 419 U.S. 1034, 95 S.Ct. 516, 42 L.Ed.2d 309 (1974).

Present tenants have benefitted by changes in the relationships to their landlord which, taken in the aggregate, have substantial financial value both now and in the future. It will serve to strengthen the existing landlord/tenant relationship. Claims of the class '76 or class '80 tenants who are no longer tenants in the Marketplace are purely financial, based on claims of past overcharges. As to these, the repayment set out in the settlement agreement fairly reflects both the risk that they would be unable to prove entitlement to such repayments and the risk that the amounts of their claimed damages would be shown to be less than alleged.

My conclusion that the different treatment of different segments of the class is reasonable is reinforced by the procedural integrity of the settlement negotiation process which I had described earlier.

In addition, it is reinforced by the fact that I have described, which has permitted any member of the plaintiff class, including past tenants, to opt out of this settlement if they did not find it attractive. It appears that only two former tenants opted out. Others, however, could have if they found in their view that the proposed settlement unfairly favored present tenants.

This litigation has consumed nearly four years. The substantial discovery, and several hearings which I have held, have permitted the parties and the Court to have the information necessary to make an informed assessment of the settlement. A trial would be lengthy and burdensome for the parties. The outcome for each party would be uncertain. These facts contribute to the reasonableness of the settlement.

■ With regard to the attorneys' fees and expenses aspect of the settlement, my findings are as follows. In general, I find the agreed upon the amount of attorneys' fees, that is $500,000, to be reasonable and the maximum reimbursable expenses of $20,000 also to be reasonable.

As indicated earlier, when I was asked to approve circulation of the settlement agreement to class members as a possibly fair

settlement, I had questions concerning the reasonableness of the amount of the attorneys' fees. I wanted to be fully informed on that issue. At that point the parties were in agreement so the adversary process could not be expected to operate in its usual fashion to fully inform the Court. Accordingly, I appointed John M. Harrington to serve as *amicus* and as an expert witness with regard to the law and the facts and the ultimate conclusion concerning the reasonableness of the proposed attorneys' fees in this case. At the time I did that, I did not feel comfortable with the parties' argument that the decision in *In re Warner Communications*[13] accurately described the applicable law.

I have received Mr. Harrington's excellent report of April 6, 1987. Mr. Harrington reviewed affidavits and documents and interviewed counsel with a view to advising the Court concerning relevant facts on the attorneys' fees issue, fully briefed the applicable legal issues, and confirmed the Court's belief that the *In re Warner Communications* analysis was inadequate for this case. He did, however, agree with the parties' conclusions and contentions that the amount of attorneys' fees and expenses agreed to is within the range of reason. I found Mr. Harrington's report to be persuasive. In reviewing the documents, I concur with his recommended conclusions regarding the relevant facts and his conclusion. I would also reiterate his participation has definitely expedited the resolution of this case. There would have been a considerable delay if it were necessary for the Court to do the factual and legal analysis Mr. Harrington did from scratch.

I hereby adopt the report of the *amicus curiae* and expert witness dated April 6, 1987, and incorporate it by reference as part of this opinion. I will, however, briefly summarize some of the principal points in that report, although I do not by the summary intend to suggest that the points I may not mention are not meaningful.

As I indicated earlier, I am satisfied that as part of the class settlement initially agreed to and not changed in any material

---

**13.** *In re Warner Communications Securities Litigation,* 618 F.Supp. 735, 746–51 (S.D.N.Y.1985).

respect, the defendants agreed to pay the plaintiffs' reasonable attorneys' fees. However, at the time the amount to be paid to the plaintiff class was agreed to, the amount of attorneys' fees to be assessed against the defendants was, by agreement, to be left to the Court. It was only later, independent of the agreement on what the class would receive, that the parties further agreed that the defendants would pay $500,000 in attorneys' fees and up to $20,000 in disbursements. Once again, this was independent of the settlement as it related to class members and the result of good faith, arm's length negotiations.

I find that the law is carefully and correctly characterized in Mr. Harrington's report. I particularly agree with him and the authorities he cites for the proposition that agreements on attorneys' fees between the parties are to be encouraged. I have looked at this to determine whether $500,000 in fees or $20,000 of expenses is within the range of reason for this case. I have not attempted to determine whether that is precisely the figure I would have awarded if I were called upon to determine reasonable attorneys' fees without the benefit of those agreed upon figures.

Some of the factors that influenced Mr. Harrington and influence me in concluding that the agreed upon figures are within the range of reason include the following. This case was vigorously contested. The settlement negotiations were also arduous. I find that the hours spent by plaintiffs' counsel are reasonable. I also find that the rates charged by plaintiffs' counsel are within the customary range for comparable attorneys in Boston. I find that the delay plaintiffs' counsel have endured in obtaining payment makes the use of their current rates appropriate. I concur in Mr. Harrington's calculation that the lodestar in this case is about $352,437.50. That means that the multiplier is, in effect, 1.42. I find that multiplier to be reasonable. In this case it is uncertain whether the class would be certified, as I explained earlier. There is also a meaningful risk that the plaintiffs would not prevail on any or all their claims.

In addition, plaintiffs' counsel would be entitled to one third of the recovery of at least many of the plaintiffs under their contingent-fee agreements. While the settlement is, as I said, hard to value, it certainly seems that $500,000 is less than one third of its value. Mr. Harrington has found, and I agree, that in cases like this case the customary range of multipliers seems to be about 1.25 to 2. This is within that range. Similarly, the disbursements of up to $20,000 seems reasonable in view of the nature of this case.

I have considered whether a decision concerning the reasonableness of the settlement, and particularly reasonableness of the attorneys' fees, ought to be withheld pending the United States Supreme Court's likely forthcoming decision in *Pennsylvania, et al. v. Delaware Valley Citizens' Council for Clean Air.*[14] That case, I'm advised, raises a question concerning whether a lodestar star amount may be enhanced to reflect the risk that no attorneys' fees may be obtained from the defendants. I decided that it is not necessary or appropriate to defer a decision with regard to the reasonableness of attorneys' fees particularly, or for the reasonableness of the settlement generally, in anticipation of the decision in that case.

The amounts that the plaintiffs will receive in this settlement were negotiated and agreed upon before the amount of attorneys' fees were negotiated and agreed upon. If I were to decide that the $500,000 attorneys' fees is unreasonable in light of what the Supreme Court decides in the *Delaware Valley* case, there would be no benefit to the plaintiffs. This is not a case where there is a single sum of money the Court is called upon to allocate between plaintiff class and the attorneys. The plaintiffs, through their counsel and through Mr. Berenson, the first named plaintiff, urgently request immediate approval.

---

**14.** In 1986, the Supreme Court heard re-arguments on the referenced aspect of *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air.* Its decision was rendered after the opinion in this case. *See* — U.S. —, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987).

The defendants, through their counsel, also urgently request immediate approval. It appears that it is only the defendants who could benefit if, as a result of the forthcoming Supreme Court decision, the Court decides that no multiplier is appropriate in this case, and the award of legal fees must be reduced. The defendants, through their counsel, have expressly represented and reiterated that they do not request any possible benefit that might accrue to them from the forthcoming Supreme Court decision in the *Delaware Valley Citizens* case. Rather it is their desire to promptly pay $520,000, or up to that amount depending on the disbursements, in connection with the prompt approval of this proposed settlement. The defendants are sophisticated business entities with good counsel. They are capable of fending for themselves.

It is this Court's duty to assure the fairness of the settlement to all members of the plaintiff class. They would get no possible benefit from reduction of attorneys' fees. They would be injured by delay in obtaining the approval of settlement they desire. They may also be injured by not receiving relief from their contingent-fee agreements. Under these circumstances, the possible evolution of the law that the *Delaware Valley Citizens* case may represent is not material to the reasonableness of the settlement or the attorneys' fees component of the settlement in this case.

Accordingly, on the basis of the foregoing, the Court concludes that the proposed settlement agreement is fair, adequate and reasonable. It is, therefore, hereby approved.

### REPORT OF AMICUS CURIAE AND EXPERT WITNESS

This report is made pursuant to the order of the Court dated February 4, 1987 in the above-captioned case. Attached to this report are affidavits submitted by counsel and time records of plaintiffs' counsel.[1] In preparing this report, I have examined the docket in this case, pleadings and other court filings, transcripts of hearings, discovery materials including depositions, and plaintiffs' counsel's communications with the class. I have also met with counsel. I wish to acknowledge particularly the assistance of Ann Pauly Michalik, Esq., of Ropes & Gray, in the preparation of this report.

The context in which the questions arise may be briefly described as follows:

On June 24, 1983, eleven retail tenants ("the Named Plaintiffs") of the Faneuil Hall Marketplace ("the Marketplace") brought suit in the Suffolk Superior Court for the Commonwealth of Massachusetts against the Marketplace and Faneuil Galley, Inc. ("Faneuil Galley") on their own behalf and on behalf of all similarly situated retail tenants who have or have had leases with the Marketplace or subleases with Faneuil Galley containing certain clauses. In their complaint, the Named Plaintiffs claimed misrepresentations, breach of lease agreements, and unfair and/or deceptive trade practices by the defendants with respect to charges imposed on the tenants under three standard lease clauses which required each lessee to pay its proportionate share of real estate taxes, common facilities costs, and the heating and/or air conditioning system costs. The action was removed to the United States District Court for the District of Massachusetts on June 30, 1983.

There then ensued a period of discovery, involving hard fought disputes, and a vigorously contested issue of the certification of the class. The defendants filed counter-

---

1. The affidavits of Stephen R. Delinsky, Esq., Richard R. Goldberg, Esq., Erik Lund, Esq., (March 6, 1987 and March 23, 1987), John M. Moran, Esq. (March 10 with Substituted Schedule and March 31, 1987), Noel G. Posternak, Esq., Donald H. Siegel, Esq. and William P. Stimson, Esq. are attached to this report in an appendix. The computer printout of the time charges and disbursements of Posternak, Blankstein & Lund is found in the Affidavit of Noel G. Posternak, Exhibit ——. A record of Mr. Moran's time charges is found in the Affidavit of John M. Moran (March 10, 1987 with Substituted Schedule). The computer printout from Posternak, Blankstein & Lund shows hours charged on a weekly basis, which is not an unusual method of computer recording, except that for a certain period, for reasons extraneous to this matter, Mr. Hatem's time is recorded on a daily basis.

claims against nine of the Named Plaintiffs and discovery was sought and resisted with respect thereto. Following a hearing, the Court certified the class on January 5, 1984. Discovery continued, and the parties disputed with respect to the form of notice to the class.

Although settlement was discussed as early as July, 1983, the first meetings among the parties which led to the settlement agreement now before the Court occurred in April and/or May of 1985.[2] During these meetings, the parties presented their respective proposals for a settlement agreement. (Affidavit of Richard R. Goldberg ("Goldberg Aff.") at 2; Affidavit of Noel G. Posternak ("Posternak Aff.") at 2). After a hiatus of five or six months, the parties met again on October 31, 1985 to resume their settlement negotiations. (Posternak Aff. at 3). Among the issues discussed at the October meeting was whether the defendants would pay the legal fees incurred by the plaintiffs in pursuit of this action. (Posternak Aff. at 3). The defendants agreed to pay the plaintiffs' legal fees and, although no dollar amount was discussed, the plaintiffs' counsel requested payment of fees plus a premium. (Posternak Aff. at 3; Goldberg Aff. at 3). Negotiations concerning other and substantive items of the settlement continued. (Goldberg Aff. at 3).

On November 21, 1985 the parties met to discuss all aspects of the proposed settlement, including payment of attorneys' fees. (Goldberg Aff. at 3). At that meeting, Mr. Posternak requested $700,000.00 for legal fees, informing Mr. Goldberg of the existence of contingency fee agreements between 43 members of the plaintiff class and its counsel dated July 8, 1983. (Goldberg Aff. at 3; Posternak Aff. at 3 and Exhibit A). These agreements provided that counsel would receive 33⅓ percent of all amounts recovered in this action. (See Posternak Aff., Exhibit A). Mr.

Goldberg countered with an offer of $250,-000.00. (Goldberg Aff. at 4; Posternak Aff. at 4.) In early December, 1985, the parties agreed that the defendants would reimburse the plaintiff class for its legal fees at an amount to be determined by the Court. (Goldberg Aff. at 4; Posternak Aff. at 5). A letter from Mr. Posternak to Mr. Goldberg dated December 13, 1985 which set forth the agreed upon settlement provisions memorialized the parties' understanding with regard to legal fees. (See Posternak Aff., Exhibit B). It stated in paragraph IX: "The offer is that Rouse will reimburse the plaintiffs' legal fees and disbursements, the amount thereof to be determined by the Court." This appears to be the first writing memorializing the substantive terms of the proposed settlement agreement.

Following further negotiations on issues other than the payment of legal fees, Messrs. Goldberg and Posternak executed a letter agreement dated January 16, 1986 setting forth the parties' understanding of the defendants' settlement offer; the provision concerning payment of legal fees did not change. (See Posternak Aff., Exhibit C, ¶ X). The January 16, 1986 letter was presented at a meeting of the Tenants' Association on January 22, 1986. (Posternak Aff. at 6). After some discussion, members of the Tenants' Association approved the settlement proposal as set forth in the January 16, 1986 letter by a vote of 56 to 4, with 8 members abstaining. (Joint Memorandum in Support of Joint Motion for Entry of Scheduling Order at 20–21).

Shortly thereafter, counsel for the plaintiff class prepared the first draft of the proposed settlement documents. (Goldberg Aff. at 5). The draft required the defendants to waive any rights to appeal the Court's determination of reasonable legal fees, a provision which the defendants found unacceptable. (Goldberg Aff. at 5). The issue was discussed at a meeting held

---

**2.** The affidavits submitted in this matter differ as to the date of the first substantive settlement meeting. According to the Affidavit of Richard R. Goldberg, Esq., an attorney with The Rouse Company who was counsel to the defendants, the first settlement meeting occurred on April 25, 1985. Mr. Posternak's affidavit states, however, that the first settlement meeting took place on May 20, 1985. The exact date of the first settlement conference has no impact on the questions at issue here.

on March 13, 1986, and finally, on April 1, 1986, the parties agreed that if the defendants appealed the Court's fee determination, then the defendants would pay plaintiffs' counsel $325,000.00[3] as a non-refundable minimum payment for fees and disbursements. (Posternak Aff. at 7).

In September of 1986, Messrs. Goldberg and Posternak again discussed the issue of legal fees. (Posternak Aff. at 8). At some point, Mr. Posternak offered to settle in the amount of $500,000.00 for attorneys' fees plus disbursements not to exceed $20,000.00. After some discussion, the defendants accepted the offer early in October of 1986. (Goldberg Aff. at 6). This agreement was incorporated into the final settlement documents which were presented to the Court and to the class.

### Discussion of Applicable Law

The authorities encourage parties situated as those herein to agree as to the amount of counsel fees to be paid. Whether a defendant is required by statute or agrees as part of the settlement of a class action to pay the plaintiffs' attorneys' fees, ideally the parties will settle the amount of the fee between themselves. *Hensley v. Eckerhart*, 461 U.S. 424, 437 [103 S.Ct. 1933, 1941, 76 L.Ed.2d 40] (1983); *Malchman v. Davis*, 761 F.2d 893, 905 (2d Cir. 1985), *cert. denied*, [475 U.S. 1143] 106 S.Ct. 1798 [90 L.Ed.2d 343] (1986); *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 720 (5th Cir.1974). As the Court of Appeals for the Fifth Circuit stated in the frequently-cited *Johnson* opinion:

> In cases of this kind, we encourage counsel on both sides to utilize their best efforts to understandingly, sympathetically, and professionally arrive at a settlement as to attorney's fees. Although a settlement generally leaves every litigant partially dissatisfied, so does a judicial award for attorney's fees.

488 F.2d at 720. Absent evidence of collusion or a "sweetheart" relationship between counsel for the plaintiff class and for the defendant, settlement between the parties of the fee award should be encouraged, just as are settlements of the disputes themselves. *Malchman v. Davis*, 761 F.2d at 905.

The authorities nevertheless suggest that in various circumstances a court should examine for reasonableness an agreement as to fees. A court can generally assume that the defendants have closely examined the plaintiffs' fee request and agreed to pay only a reasonable amount when the settlement of attorneys' fees was negotiated subsequent to court approval of the settlement's provisions regarding the substantive claims in the suit. *In re Fine Paper Antitrust Litigation*, 751 F.2d 562, 582 (3d Cir.1984.) If, however, the parties negotiated both the attorneys' fees and the issues of the suit simultaneously, the court may be concerned that the terms of the settlement have been influenced by the size of the negotiated fee award. *See Malchman v. Davis*, 761 F.2d at 904. *Manual for Complex Litigation, Second* § 23.24 (1985); A. Miller, *Attorneys' Fees in Class Actions* 219 (Federal Judicial Center 1980). Even though the fee may not technically come from a class fund created by a settlement and any reduction in the fee award will not benefit the class, a court may examine the fee agreed upon to ensure that it is reasonable. *See e.g., Foster v. Boise–Cascade, Inc.,* 420 F.Supp. 674 (S.D.Tex. 1976), *aff'd,* 577 F.2d 335 (5th Cir.1978); *See also Grunin v. International House of Pancakes,* 513 F.2d 114, 128 (8th Cir.), *cert. denied,* 423 U.S. 864 [96 S.Ct. 124, 46 L.Ed.2d 93] (1975) (rejected argument lesser standard of review applies where attorneys agree to amount of fee award which was not to be deducted from the class recovery). Settlements regarding attorneys' fees are not binding on the courts. *E.g., Foster v. Boise–Cascade, Inc.,* 577 F.2d at 336. The *Manual for Complex Litigation, Second* at § 23.24 may be considered to suggest that because of the problems which may result from the appearance of a conflict of interest when the defendant agrees to pay a certain amount

---

**3.** Mr. Posternak proposed this figure based on the legal fees already incurred and estimates of additional amounts expected to be incurred in the future.

in attorneys' fees as part of a settlement agreement procedure, it is preferable that the parties either agree that the amount of attorneys' fees will be left to the discretion of the court or negotiate the amount of the fee award subsequent to the court's approval of the settlement on the merits.

When considering a request for attorneys' fees, courts apply the same analysis regardless of the type of litigation involved.[4] *See e.g., Wildman v. Lerner Stores Corp.,* 771 F.2d 605 (1st Cir.1985) (civil rights); *Malchman v. Davis,* 761 F.2d at 893; (antitrust); *In re Elmendorf Board Corp.,* 57 Bankr. [B.R.] 580 [Bankr.] (D.N.H.1986) (bankruptcy); *In re "Agent Orange" Product Liability Litigation,* 611 F.Supp. 1296 (E.D.N.Y.1985) (tort class action); *Dekro v. Stern Bros.,* 571 F.Supp. 97 (W.D.Mo.1983) (securities); *Corbett v. Keene Co-operative Bank,* 498 F.Supp. 800 (D.N.H.1980) (Truth in Lending Act). In each case, the attorneys' request for fees is examined for "reasonableness." *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* [—— U.S. ——] 106 S.Ct. 3088, 3096–97 [92 L.Ed.2d 439] (1986). Over the years, the courts have endeavored to formulate a procedure for determining what constitutes reasonable attorneys' fees. *Id.* at 3097. In *Blum v. Stenson,* 465 U.S. 886 [104 S.Ct. 1541, 79 L.Ed.2d 891] (1984), a case of central importance, the United States Supreme Court, in a statutory fee case, endorsed a two-step approach. The first step involves the calculation of a lodestar figure "by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate." *Id.* at 888 [104 S.Ct. at 1544]. The second step involves consideration of the appropriateness of an upward adjustment to the lodestar figure. *Id.*

To establish the lodestar, a court first determines the number of hours reasonably spent pursuing the suit. *Grendel's Den,*

*Inc. v. Larkin,* 749 F.2d 945, 950 (1st Cir. 1984). In so doing, the court examines the number of hours actually spent and subtracts from that number hours which it determines were duplicative, unproductive, excessive or otherwise unnecessary. *Id.* Attorneys must submit to the court detailed records of the time each person spent on the case and the duties he or she performed. *King v. Greenblatt,* 560 F.2d 1024, 1027 (1st Cir.1977), *cert. denied,* 438 U.S. 916 [98 S.Ct. 3146, 57 L.Ed.2d 1161] (1978). Preferably, attorneys will submit contemporaneous time records which supply details such as the date, kind of work, and time spent on each task. *Calhoun v. Acme Cleveland Corp.,* 801 F.2d 558, 560 (1st Cir.1986). It is also preferred, but not necessary, that each attorney file an affidavit attesting to the accuracy of the time records. *Id.* at 559–60. If the attorney has not exercised "billing judgment" prior to submitting his or her fee records, then the court may do so. *E.g., Hensley v. Eckerhart,* 461 U.S. at 434 [103 S.Ct. at 1940]; *Rogers v. Motta,* [655 F.Supp. 39] No. 83–1045 (D.Mass. January 21, 1986) (LEXIS, Genfed library, Dist. file). In setting a reasonable number of attorney hours, hours which the attorney would not have billed to the client should not be included. *Brown v. Gillette Co.,* 536 F.Supp. 113, 120–21 (D.Mass.1982). The attorney should not be expected, however, to reduce his or her claim for hours spent on a matter which may appear excessive at first glance but are the result of stubborn and vigorous opposition by the other side. *See In re Casco Bay Lines, Inc.,* 25 Bankr. [B.R.] 747, 755 n. 18 (1st Cir.1982); *Brown v. Gillette,* 536 F.Supp. at 120. The court may also review the time records to ascertain whether tasks were performed by an individual with the skills appropriate to the

---

**4.** In addition to over one hundred statutes providing for attorneys' fees, courts recognize three other exceptions to the "American Rule" that a prevailing litigant cannot collect his legal fees from the losing party. *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* [—— U.S. ——] 106 S.Ct. 3088, 3096 & n. 6 [92 L.Ed.2d 439] (1986). A court will award attor-

neys' fees where: (1) a party has willfully violated a court order; (2) a losing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons; or (3) in exercise of its equitable powers when plaintiffs have recovered a "common fund" for themselves and others. *Id.* at 3096 n. 6.

task. *E.g., In re "Agent Orange" Product Liability Litigation*, 611 F.Supp. at 1307.

In addition to establishing a reasonable number of hours spent on a case, the court also must determine reasonable hourly rates. *Calhoun v. Acme Cleveland Corp.*, 801 F.2d at 560. This requires reviewing information about fees customarily charged for similar legal services in the community and about the attorneys' experience and billing practices. *Id.* Affidavits from other attorneys in the community may be used to establish that the attorneys' rates are within the range generally charged for similar services. *Daly v. Hill*, 790 F.2d 1071, 1080 (4th Cir.1986). The court need not set the same rate for all work performed by a particular attorney; it may assign a different hourly rate to different categories of tasks. *Miles v. Sampson*, 675 F.2d 5, 9 (1st Cir.1982). *See also HEW Corp. v. Tandy Corp.*, 480 F.Supp. 758, 761 (D.Mass.1979) (assigned lower hourly rate to ministerial or clerical work than to purely legal work).

The court may also assign hourly rates on a historical or current rate basis. The use of current market rates may compensate the attorneys for the delay in payment of their fees, that is, for inflation and interest, as well as simplify the task of the district court. *Daly v. Hill*, 790 F.2d at 1081; *Grendel's Den, Inc. v. Larkin*, 749 F.2d at 955. This approach is appropriate when a case has lasted only a few years. *Ohio–Sealy Mattress Manufacturing Co. v. Sealy, Inc.*, 776 F.2d 646, 663 (7th Cir. 1985).[5] With commercial cases, it is assumed that the cost of waiting for payment will be recovered in the final fee award. *In re "Agent Orange" Product Liability Litigation*, 611 F.Supp. at 1328. This assumption is reflected in the high percentage of the recovery amount the attorney gets in a case taken on a contingency fee basis. *Id.*

Services rendered by paralegals and law clerks may be included in the lodestar or treated separately as costs. *Bogosian v. Gulf Oil Corp.*, 621 F.Supp. 27, 30 (E.D.Pa. 1985). The attorneys may be reimbursed for paralegal time by the amount normally billed a paying client or at a rate that reflects the costs of salary, overhead and a profit. *See id.; In re "Agent Orange" Product Liability Litigation*, 611 F.Supp. at 1322.

Once the lodestar figure is determined, the issue becomes whether the lodestar should be adjusted upward or downward to account for factors not included in the figure. Prior to the Supreme Court's decision in *Blum v. Stenson*, courts in the First Circuit deciding whether to apply a multiplier generally considered the twelve factors first enunciated by the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d at 714 and later adopted by the First Circuit in *King v. Greenblatt*, 560 F.2d at 1026–27.[6] A. Miller, *Attorneys' Fees in Class Actions*, at 77. In *Blum*, however, the Supreme Court stated that the novelty and complexity of issues are factors which are reflected in the number of billable hours recorded by counsel, and that the presence of these factors does not warrant an upward adjustment of the award. 465 U.S. at 898 [104 S.Ct. at 1548]. In addition, the Court stated, the experience and skill of the attorney should be reflected in the reasonableness of the hourly rate. *Id.* The quality of representation

---

**5.** In cases which go on for protracted periods of time, use of the current rates for all hours spent may produce a windfall for the plaintiffs' counsel since changes in rates will reflect the attorney's increased experience and skill as well as the effects of inflation. *Ohio–Sealy Mattress Manufacturing Co. v. Sealy, Inc.*, 776 F.2d at 663.

**6.** The twelve factors are: (1) the time and labor required; (2) the novelty and difficulty of the question presented; (3) the skill required to perform the legal services; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by client or circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; (12) awards in similar cases. *King v. Greenblatt*, 560 F.2d at 1026–27. These criteria are similar to those in the ABA Code of Professional Responsibility. *Id.*

afforded by the attorneys therefore justifies an upward adjustment only in rare cases where the fee applicant demonstrates to the court that the lodestar does not reasonably reflect the high quality of legal services rendered in the case. *Id.* at 899 [104 S.Ct. at 1549]. The First Circuit has decided that upward adjustments for quality of representation "are to be few and far between." *Wildman v. Lerner Stores Corp.,* 771 F.2d at 610, quoting *Garrity v. Sununu,* 752 F.2d 727, 739 (1st Cir.1984). Finally, the "results obtained" factor generally will be subsumed within the other factors used to calculate a reasonable fee. *Blum v. Stenson,* 465 U.S. at 900 [104 S.Ct. at 1549].[7]

What remains after the lodestar has been established in most cases, therefore, is consideration of whether a multiplier should be applied to account for the contingent nature of the action, assuming that the contingency factor has not been already provided for in the hourly rate.[8] *See Wildman v. Lerner Stores Corp.,* 771 F.2d at 605. If the hourly rate used in the lodestar is the same rate charged regular paying corporate clients, then the contingency factor was not included in the lodestar. *Brown v. Gillette Co.,* 536 F.Supp. at 123. The Supreme Court has yet to decide whether an award of attorneys' fees may, or should, be adjusted upward to account for the attorneys' risk of loss in the event the plaintiffs lose the suit. *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 106 S.Ct. at 3100.[9] The First Circuit, subsequent to *Blum,* has determined that the risk of losing justifies a multiplier. *Wildman v. Lerner Stores Corp.,* 771 F.2d at 613. In *Wildman,* the Court of Appeals for the First Circuit stated that an upward adjustment to the lode-

star is warranted when the attorneys have borne actual risks and burdens associated with pursuit of the action. *Id.* The fact that the case was taken on a contingent fee basis does not prove actual risk. *Id.* The court in *Wildman* noted that when considering whether to adjust the lodestar fee upward to account for the contingent fee risk, courts have considered the uncertainty of the class members' ability to prove liability and damages; whether there has been a prior decision in the jurisdiction concerning the theories on which the case is based; whether the government has taken any action against the defendant; the time the case consumed; any public interest incentive involved; whether other attorneys refused to take the case; the degree to which the attorney was precluded from taking other work; and the degree to which the attorney assumed a personal risk of nonpayment. *Id.* at 612. The contingent nature of an attorney's undertaking should be measured against an appraisal of the likelihood of success in obtaining a judgment or settlement at the time when the attorney's time was committed to the case. *In re Fine Paper Antitrust Litigation,* 751 F.2d at 583.

When a court has determined that an upward adjustment is warranted, it must then decide the size of the multiplier and to which hours the multiplier should be applied. Multipliers greater than two are unusual even in complex litigation. *Wildman v. Lerner Stores Corp.,* 771 F.2d at 613. As the Court of Appeals for the First Circuit noted in *Wildman,* "[w]hile multiples of 2, 3, 4, and 4.5 have occasionally been given, these multipliers occur primarily in protracted multidistrict antitrust and securities cases involving recoveries of ten mil-

---

**7.** In considering this factor, the court would look at the percentage of the recovery amount which the fee request represents. This may be appropriate in a common fund case. *See Blum v. Stenson,* 465 U.S. at 900 n. 16 [104 S.Ct. at 1550 n. 16].

**8.** Delay in payment also may be grounds for an upward adjustment of the lodestar when historical rates are used in calculating the reasonable hourly rates. *E.g., Rogers v. Motta,* [655 F.Supp.

39] No. 83–1045 (D.Mass. January 21, 1986 LEXIS, Genfed library, Dist. file).

**9.** On October 15, 1986, the Supreme Court heard reargument in *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air* on the issue of upward adjustment to a lodestar to account for the risk of loss. As of April 1, 1987, no opinion had been issued in the case. Telephone Interview with Clerk, United States Supreme Court (April 1, 1987).

lion dollars or more." [10]   *Id.*   While no exhaustive study of multipliers has been discovered, an informal review of recent decisions reveals that multipliers between 1.25 and 2 are most common.   *E.g., Malchman v. Davis,* 761 F.2d at 905 n. 7 (1.685); *Bogosian v. Gulf Oil Corp.,* 621 F.Supp. at 31 (1.5); *In re "Agent Orange" Product Liability Litigation,* 611 F.Supp. at 1331, 1334 (1.5 and 1.75).   In several cases, no multiplier at all was applied because the plaintiff failed to demonstrate that the lodestar did not provide fair and reasonable compensation.   See *Jordan v. Multnomah County,* 799 F.2d 1262, 1267 (9th Cir.1986); *Planned Parenthood v. State of Arizona,* 789 F.2d 1348, 1354 (9th Cir.1986); *Wheeler v. Mental Health & Mental Retardation Authority,* 752 F.2d 1063, 1073 (5th Cir. 1985).

The multiplier need not be applied to the total lodestar amount, to all counsel or to all tasks.   *In re "Agent Orange" Product Liability Litigation,* 611 F.Supp. at 1314. Indeed, it has been said that it should not be applied to paralegal hours.   *E.g. Bogosian v. Gulf Oil Corp.,* 621 F.Supp. at 30. Determination of the amount of the multiplier and to which attorneys' fees it should be applied remains an inexact science within the discretion of the court.

In addition to attorneys' fees, plaintiffs' attorneys are also entitled to reimbursement of reasonable and necessary out-of-pocket expenses.   *E.g., In re "Agent Orange" Product Liability Litigation,* 611 F.Supp. at 1314.   The court applies a similar test of reasonableness to determine which expenses should be compensated in the fee award.   *Grendel's Den, Inc. v. Larkin,* 749 F.2d at 951.

Applying the teaching of the foregoing authorities to the facts at bar, i.e., where payment of plaintiffs' attorneys' fees was discussed throughout the settlement negotiations, but where at the time of substantial agreement as to important provisions that amount was to be determined by the Court and only subsequently an agreement as to amount was reached between the parties, I respectfully suggest that it is appropriate for the Court to review the agreed upon amount to determine if it fits within the standards of reasonableness.   In the remainder of this report, I give my opinion as to whether or not it does.   In reaching my conclusion, I do give weight to the agreed upon amount in recognition of the general proposition that agreements between the parties are to be encouraged.

Also, it should be noted that in this case, some of the members of the plaintiff class were clients of Mr. Moran and some of Posternak, Blankstein & Lund prior to the institution of this action.   This fact has an independent utility in considering the weight to be given to the agreement in reviewing the reasonableness of the fee. The authorities suggest that an important reason for a court's review of a fee agreement which was negotiated in connection with a settlement on the merits of the action is so that the Court can be satisfied that the interests of the class were not adversely affected by the fee negotiations or agreement.   Frequently, counsel for the class has no continuing relationship with the class members and thus the desire for a present fee is not disciplined by the constraints of a past and prospective long term relationship.   Here it is apparent that Mr. Moran in particular had and has a continuing relationship with individual tenants who are members of the class, and that it is in his long term interest, and that of Posternak, Blankstein & Lund as well, that the settlement be consistent with the best interests of his, and their, continuing clients.

**10.**   In *In re Warner Communications Securities Litigation,* 618 F.Supp. 735, 738, 749 (S.D.N.Y. 1985) *aff'd on other grounds,* 798 F.2d 1415 [35] (2d Cir.1986), a securities class action in which 19 actions were consolidated, the district court discussed application of a multiplier of 2.26 to the lodestar.   To support this number the court cited nine cases where multipliers of three or larger had been used.   *Id.* at 749.   An analysis of the cases cited shows that, in most cases, the multiplier was calculated on the basis of factors which, following the Supreme Court's decision in *Blum v. Stenson,* 465 U.S. 886 [104 S.Ct. 1541, 79 L.Ed.2d 891] (1984), should be reflected in the lodestar figure.   In addition, seven of the cases involved complex securities and antitrust litigation.

*Opinion As To Reasonableness*

My opinion is that the amount agreed upon by the parties is within the range of reasonableness. My reasons for this opinion follow.

I address first the reasonableness of the hours spent, which for Posternak, Blankstein & Lund are 2,041 hours of lawyers' time and 298.5 hours of paralegal time and for Mr. Moran are 309.6 hours.

The time records of Posternak, Blankstein & Lund show the following as to hours and standard time rates of the lawyers, law clerks and paralegal who performed the most substantial work on the matter.

| Name | Yr. of Admission | Hours | Time Rate Per Hour |
|---|---|---|---|
| Noel G. Posternak | 1961 | 256.25 | $160–250 |
| Erik Lund | 1961 | 212.25 | 175–210 |
| Donald H. Siegel | 1972 | 165.5 | 130–195 |
| * David J. Hatem | 1977 | 570.25 | 95–150 |
| Sherry Y. Mulloy | 1977 | 150.25 | 80–90 |
| John Egan | 1982 | 100.75 | 70–100 |
| Steven S. Broadley | 1983 | 415 | 60–90 |
| Jane E. Sender | 1985 | 79.25 | 80–95 |
| Law Clerks | not applicable | 130.00 | 45–50 |
| Barbara E. McCord | Paralegal | 129.25 | 45–50 |

\* Mr. Hatem became a partner in January of 1985. His time rate reflects his range of hourly charges both as an associate and as a partner. There was also time, in small amounts, charged by other lawyers and paralegals. The aggragate of all time charged to the matter through January 25, 1987 was 2,339.25 hours.

---

James M. Moran, Esq., has presented affidavits which detail 309.6 hours. This listing is not in computer printout form, but Mr. Moran's affidavit explains the method by which he summarized from contemporaneous records. From my observation as to his activities as reflected in deposition and hearing transcripts and references to Mr. Moran in the computer printout of Posternak, Blankstein & Lund, I am satisfied that his listing of time spent is substantially in accord with what occurred.

In considering whether or not the number of hours spent were reasonable, I have considered the nature of the matter, the kinds of tasks performed, the distribution of time amongst partners, associates and paralegals, and, as a comparative check, I have examined the number of hours spent by the defendants on this matter. The tasks performed were primarily coordination and communication with the Named Plaintiffs and prospective class members; framing the nature of the case, including review of leases; discovery; the issue of class certification; and the negotiation and drafting of the settlement agreement and related documents. There is included in the appendix to this Report an analysis of the time spent as divided among the major kinds of tasks performed as appears in the time records.

I also observe that a particular need in this litigation was to forestall any retaliation which might cause tenants to leave the class. Plaintiffs' counsel addressed this problem at the outset, obtained a letter agreement which served in lieu of an injunction, and thereafter policed the agreement.

Because of the nature of the situation, it is not surprising that the number of hours spent in conference amongst counsel and in communication with clients was substantial. This litigation involved not simply one representative plaintiff but a substantial number of plaintiffs who were representative of a larger class, and the interests of the class members were not identical. This resulted in the necessity for considerable coordination amongst the plaintiffs. The existence of numerous plaintiffs provided the opportunity for the defendants to seek

discovery by way of interrogatory and deposition from each of the Named Plaintiffs. Equally, counterclaims were brought against nine of the Named Plaintiffs. It is apparent that this case was a hard-fought contest, and tactics and strategy were of central importance. I have examined the communications from plaintiffs' counsel to the class members, and those frequent and regular communications were a reasonable and necessary part of counsel's performance. The situation thus differs markedly from that which exists in many class actions, where the class representative is in reality little more than nominal.

Mr. Moran appears to have served two roles in this case: that of an additional lawyer on the litigation team, preparing certain of the Named Plaintiffs for deposition and representing them at depositions, and more significantly, that of an important participant in the task of maintaining communication amongst and advising the Named Plaintiffs and the tenants and co-counsel.

There are no reported cases, so far as I can tell, which involve circumstances of a class structured similarly to that presented here, so there is no comparative benchmark as to issues and time spent. Generally in a matter such as this where discovery is strongly contested and the settlement is necessarily complex because of the nature of the issues and the class, and where coordination and communication among counsel and Named Plaintiffs and the class is of vital importance, it is not possible to particularize, after the fact, whether specific time was unproductive, duplicative, or otherwise unnecessary. However, from my own experience with complicated commercial litigation, it does not appear to me, after reviewing the work product of and reflected by court papers, transcripts, discovery material, settlement documents and communications with Named Plaintiffs and the class, that the time spent was, overall, inefficient or unnecessary.

The vigor of the representation, which is reflective of time spent, was noted when the class was certified. In its order certifying the class, on January 5, 1984 [100 F.R.D. 468], which was approximately six months after the litigation had begun and after several hearings before the Court on various matters, the Court (McNaught, J.) said with respect to the conduct of the case and plaintiffs' counsel:

Thus far, the named plaintiffs have prosecuted this action vigorously. I expect and find, particularly in the light of their activity to date, that they will continue to do so. They are obviously familiar with the issues, and can assist counsel in the conduct of the litigation.

Counsel are experienced, have demonstrated that they are capable, knowledgeable and committed to the goal of providing the proposed class with vigorous representation. They have been involved in class action litigation in the past, representing both plaintiffs and defendants, have handled much commercial litigation and have committed substantial resources and effort to date.

Memorandum and Order at 6 [100 F.R.D. at 471].

A comparison of the time spent by plaintiffs' counsel and defendants' counsel shows that while plaintiffs' counsel spent approximately 2,500 hours with respect to the matter, defendants' counsel spent approximately 4,700 hours. (See Appendix for detailed analysis).

An examination of the time records of plaintiffs' counsel demonstrates that the relationship between time spent by partners, associates and paralegals was appropriate. Mr. Lund and Mr. Posternak together spent 468.50 hours. Other partners spent 237.25 hours, at lower rates. Mr. Hatem, who spent the greatest amount of time on the matter, became a partner during the course of the matter. His hours are included in either the associate or partner figure, as appropriate. Associates spent 1,335.25 hours. Law clerks spent 130 hours and paralegals spent 168.25 hours. Mr. Moran, as noted, spent 309.6 hours.

In considering the reasonableness of the hours spent as well as the issues of a multiplier, dealt with later herein, I realize that the hours recorded to the present nec-

essarily do not include time which will be spent in the future to further the settlement process. While it is difficult to quantify that amount, it will exist.

The rates charged by plaintiffs' counsel have been within the range of those customarily charged by the larger law offices in Boston. For instance, the 1983–1984 edition of *The American Lawyer Guide to Leading Law Firms,* shows that of thirteen law offices surveyed in Boston, five charged top partner rates of $200 to $225 per hour and five charged between $170 and $185 per hour. Of the thirteen, six listed $65 per hour as their lowest rate for associates, and none charged less than $50. In 1983 Mr. Lund's rate was $175 and in 1984, $200. Mr. Posternak's rate in 1983 was $175 and in 1984, $210. Associates at Posternak, Blankstein & Lund billed at rates as low as $45 per hour.

With respect to current rates, I am aware that top rates for partners at several large law firms in Boston now are from $250 to $300 per hour, and the lowest hourly rates for associates are in the $75 to $80 range. By experience, skill and reputation the office of Posternak, Blankstein & Lund, and in particular Mr. Posternak and Mr. Lund, who directed the effort, are counsel whose hourly charges are appropriately within the parameters set forth above, Mr. Posternak being at $250 per hour and Mr. Lund being at $210. Other rates are also within accepted parameters. Mr. Moran's rate of $150 per hour is well within the customary range. The energy and skill with which the matter was conducted by plaintiffs' counsel is consistent with the hourly rates involved.

Because I think the use of current rates is the most appropriate method to adjust for the delay between work spent and revenue obtained and because such delay is present in relatively acute form in this matter (e.g., approximately $109,000.00 at historical rates of time spent through 1983 for which payment is not yet obtained), I use current time rates in calculating the rea-

sonableness of the agreed upon fee. An exception is made in the case of Mr. Hatem, who became a partner January 1, 1985. To use his current rate as a partner for the time spent as an associate would not seem appropriate, and I have adjusted his rate for associate hours to the top current rate for associates, which is $125 per hour.

I do not think it is useful to attempt to calculate the percentage that the amount of the fee represents of the value of the benefit which will be obtained by the class if the settlement is approved. That approach does not appear to be favored by the current and more persuasive authorities. Moreover, in this case it is difficult to determine the dollar amount of the benefit to be conferred upon the class. It is apparent from the affidavit of Donald H. Siegel, Esq. that his determination of the value of that benefit is based upon estimates. Affidavit of Donald H. Siegel, Esq. ¶¶ 1a, 1b, 2a, 2b, 2c, 3c. It is further apparent that the benefits which are obtained by the proposed settlement will in some part inure to persons who are as yet unknown, i.e. future tenants of the marketplace who may or may not be such at the present time. Undoubtedly, the settlement is of substantial value to past, present and future tenants, but for all of the foregoing reasons, it is difficult to determine the amount of the benefits to the class members.

Turning to the last factor, that of a multiplier, in my opinion, the risks and burdens borne by plaintiffs' counsel in this matter justify the use of a multiplier. The principal risk was the uncertainty that a class would be certified, and that appears to me to have been substantial. Equally there was the risk that the plaintiffs would not prevail on the merits. Moreover, given the nature of the situation, the value of the contingency agreements with the Named Plaintiffs might be difficult to determine even in the event of a settlement or a favorable judgment.[11] While some authorities would eliminate the application of the

11. Plaintiffs' counsel have informed the Court and me that the fees to be received from defendants will satisfy any obligation which might have existed under the contingent fee agreements.

multiplier to paralegal time, the prevailing justification for a multiplier, the risk of not recovering fees, pertains to paralegal expenses with particular force, since the cash risk to the firm is greater with respect to paralegals, as with associates, than it is to partners. In the last analysis, it is the firm which must absorb their expense if no compensation with respect to them is recovered.

Accordingly, in computing the amount of multiplier which results from comparing the agreed upon sum to the lodestar amount, I have included all recorded time at current rates. Mr. Moran's hourly rate did not change. The agreed upon amount of $500,000, compared to the figure of $352,437.50, the sum of the hours multiplied by current rates (adjusted for Mr. Hatem), represents a multiplier of about 1.42. For the reasons set forth above, a multiplier of this size appears to me to be appropriate. Given the encouragement that the authorities lend to parties agreeing on fees, the figure of $500,000.00 is in my opinion within the range of reasonableness.

Finally, the disbursements for which a bill has been sent and paid of $7,854.53, and unbilled disbursement of $4,947.28, are consistent with the magnitude of the case, and are not challenged by defendants. In my opinion they should be allowed, together with $5,000.00 to reimburse the Tenants' Association for fees paid to their expert witnesses and any additional disbursements incurred hereafter in usual course, up to the agreed upon maximum amount of $20,000.

Respectfully submitted,
(s) John M. Harrington, Jr.
John M. Harrington, Jr.

Dated: April 6, 1987