Victor **BUSSIE, Morley Morgana, Quentin Dawson, and Margaret Dawson, individually and as representatives of all others similarly situated, Plaintiffs,**

v.

**ALLMERICA FINANCIAL CORPORATION, SMA Financial Corporation, First Allmerica Financial Life Insurance Company, and Allmerica Financial Life Insurance and Annuity Company, Defendants.**

No. Civ.A. 97–40204–NMG.

United States District Court, D. Massachusetts.

May 19, 1999.

Glen DeValerio, John P. Zavez, Berman, DeValerio & Pease, Boston, MA, Michael J. Griffin, Sullivan, Sullivan & Pinta, Boston, MA, Debra B. Hayes, Christopher A. Kesler, Fleming, Hovenkamp & Grayson, P.C., Houston, TX, Jody Anderman, Charles S. Lambert, Jr., LeBlanc, Maple & Waddell L.L.C., Baton Rouge, LA, for Plaintiffs.

Michelle D. Miller, Jeffrey B. Rudman, Andrea J. Robinson, Michael G. Bongiorno, Hale & Dorr, Boston, MA, Barry Z. Aframe, Worcester, MA, for Defendants.

## MEMORANDUM OF DECISION

GORTON, District Judge.

Pending before this Court for its approval is the proposed settlement agreement between the plaintiff class and the defendants Allmerica Financial Corporation, SMA Financial Corporation, First Allmerica Financial Life Insurance Company, and Allmerica Financial Life Insurance and Annuity Company (collectively "Allmerica" or "the Company"). Plaintiffs seek certification of the class and both parties seek approval of the settlement and dismissal of the claims against Allmerica.

1. Affidavit and declaration statements will be cited as "Witness Aff. ¶ ___". Unless otherwise specified, the affidavits are appended to

For the reasons set forth below, the Court has determined that (1) the class should be certified and (2) the settlement of this action is fair, adequate and reasonable and, therefore, should be approved. The Court makes the following findings of fact and conclusions of law and has issued separately a Final Order and Judgment approving the settlement and dismissing the claims in this Action with prejudice in accordance with the Settlement Agreement.

## I. Background

### A. The Parties

Allmerica is a group of companies domiciled in the state of Massachusetts. First Allmerica Financial Life Insurance Company is licensed to issue life insurance in every state in the United States, the District of Columbia and Puerto Rico. Allmerica Financial Life Insurance and Annuity Company is licensed to issue life insurance in every state in the United States, the District of Columbia and Puerto Rico, except New York where it ceased writing new business in 1994. Aframe Aff. ¶ 1.[1]

Plaintiff Victor Bussie is a resident of Baton Rouge, Louisiana. Complaint, ¶ 11. During the Class Period, Mr. Bussie purchased a $100,000 life insurance policy from Allmerica (Policy # L254693-00). Complaint, ¶ 84.

Plaintiff Morley Morgana is a resident of Baton Rouge, Louisiana. Complaint, ¶ 12. During the Class Period, Mr. Morgana purchased a $300,000 universal life insurance policy from Allmerica (Policy # L355622-0). Complaint, ¶ 90.

Plaintiff Quentin Dawson is a resident of Saint Francisville, Louisiana. Complaint, ¶.13. During the Class Period, Mr. Dawson purchased two $35,000 whole life insurance policies (Policy # 1-630-505 and 10818-391) and a $210,000 universal life

the parties' memoranda in support of the Class action settlement.

insurance policy from Allmerica (Policy # L39448650). Complaint, ¶ 97.

Plaintiff Margaret Dawson is a resident of Saint Francisville, Louisiana. Complaint, ¶ 13. During the Class Period, Mrs. Dawson purchased a $50,000 universal life insurance policy from Allmerica (Policy # L369160–00). Complaint ¶ 99.

### B. The Plaintiffs' Allegations

On November 16, 1998, the plaintiffs filed an second amended complaint ("Complaint"). The Complaint is brought on behalf of an alleged Class ("Class") of those persons or entities who at any time up through and including May 31, 1998, had an ownership interest in one or more whole life, universal life or variable universal life insurance policies issued in the United States by Allmerica Life (including its predecessors and affiliates) during the period January 1, 1978, through May 31, 1998 (the "Class Period").[2] In essence, the Complaint alleges that the Company "implemented a fraudulent scheme to increase its premium revenues, sales and profits from life insurance," and that "Allmerica induced Plaintiffs and other Class members to purchase life insurance policies by means of misrepresentations and material omissions contained in policy illustrations, sales presentations and other marketing materials disseminated by Allmerica, directly and through its nationwide sales force." Complaint, ¶ 3.

The Class's allegations pertain to the following forms of permanent life insurance sold by the Company during the Class Period:

- **Whole Life Policies.** Allmerica's whole life policies require the payment of fixed premiums for the period specified by the policy and allow the policyowner to participate in the financial experience of the Company through the receipt of dividends. These policies are designed so that, in return for payment of a fixed premium, the customer is guaranteed a minimum cash value during the life of the insured (accessed through loans or by surrendering the policy) and, if the policy remains in force, a guaranteed death benefit at the insured's death. The product anticipates, but does not guarantee, dividends payable in future years. As the Company's actual experience changes over time, dividend scales may be either raised or reduced.

- **Universal Life Policies.** Universal life policies have separate expense, mortality and interest crediting rate factors. Universal life does not receive dividends. Instead, an interest credit is applied to the policy's accumulation fund. The Company, in its discretion, can set the interest crediting rate at any amount above the minimum guaranteed rate contained in the contract. Monthly deductions are made against the policy's accumulation fund to cover, among other things, the cost of insurance and expenses. Though the amount of the monthly deduction is not guaranteed, the Company cannot raise the monthly deduction to an amount in excess of the maximum amount established in the policy.

2. The Class does not include: (1) current and former directors, officers, employees and Producers (meaning any current or former sales representatives, sales agents, general agents, branch managers, insurance brokers or solicitors) of the Defendants or any of their present or former affiliates or subsidiaries, or (2) any person who, represented by or having consulted with an attorney, signed a document pursuant to a settlement or resolution of an actual or threatened lawsuit that releases De- fendants or any of their present or former affiliates or subsidiaries from any further claims concerning their policy or policies, (unless such person or entities are Class members by virtue of their ownership interest in other polices in which case they remain in the Class but solely with respect to such other policies). The Class also does not include those who timely excluded themselves from the Class pursuant to part 7 of the Stipulation and the Court's Hearing Order.

• *Variable Universal Life Policies.* Variable universal life, like universal life, has separate expense and mortality charges and a policy accumulation fund from which those charges are deducted. Unlike universal life, where the policy accumulation fund is credited with interest by the Company, with variable universal life the fund is invested in "mutual funds" designated by the policyowner from an array of available funds. There is no minimum earning guarantee and the death benefit may fluctuate. Variable products are considered securities and, as such, must be sold with a prospectus and only by properly registered representatives.

Aframe Aff. ¶¶ 4–6. Plaintiffs allege that "[t]hese policies are not what Allmerica represented that they would be, and have not provided Plaintiffs and other Class members with the benefits promised by Allmerica in exchange for their premium dollars." Complaint, ¶ 10.

More particularly, the allegedly improper practices alleged in the Complaint include:

• *Sales Practices Related to the "Vanishing" Premium Concept.* Plaintiffs allege that "Allmerica engaged in a scheme and common course of conduct through its nationwide sales force to sell high-commission life insurance policies to the public through false and misleading uniform sales presentations and policy illustrations based upon the 'vanishing premium' concept." Complaint, ¶ 55.

• *Sales Practices Related to the Replacement of Existing Insurance with Allmerica Policies.* Plaintiffs allege that "Allmerica and its agents engaged in the improper and systematic replacement or 'churning' of life insurance policies," described by plaintiffs to consist of the "use of misrepresentations, concealment or omissions to remove the cash value from an existing policy or policies in order to finance the purchase of a new policy." *Id.* at ¶ 37.

• *Sales Practices Related to Life Insurance as an Investment Vehicle.* Plaintiffs allege that "Allmerica knowingly, recklessly or negligently permitted its agents to improperly market and sell life insurance policies as a savings plan or investment vehicle." *Id.* at ¶ 80.

• *Sales Practices Related to Representations Concerning Policy Performance.* Plaintiffs allege that Allmerica marketed and sold life insurance through the use of "policy illustrations and other sales materials and representations which promised that after a certain number or amount of premium payments were made, their life insurance policies would have a certain level of associated cash value or other benefit." *Id.* at ¶ 76.

The plaintiffs allege that these and other allegedly improper practices constituted breach of contract, fraud, breach of fiduciary duty, breach of a covenant of good faith and fair dealing, negligence, unjust enrichment, and breaches of various statutes including the federal Truth in Lending Act ("TILA").

## C. Discovery

The plaintiffs conducted extensive discovery of Allmerica, encompassing in excess of three million pages of documents, a significant volume of microfiche, and numerous audio and video tapes and other electronic media. Miller Aff. ¶ 6. The materials produced by Allmerica pertain to the insurance products at issue and the allegations of the Complaint. *See id.* at ¶ 5.

In addition to the document discovery, the plaintiffs deposed eleven former and current senior executives, managers and employees of Allmerica regarding the substantive issues raised by the Complaint. *See* Miller Aff. ¶ 9. Allmerica also undertook discovery of the named plaintiffs, reviewing extensive documentation pertain-

ing to each of their claims, and deposing each named plaintiff. Miller Aff. ¶ 10.

### D. Settlement Negotiations

Although Allmerica believed it could successfully defend this action on the merits, the Company agreed to discuss with Lead Counsel a potential settlement which would be responsive to the concerns of its policyowners and permit it to avoid the prolonged delay, costs, uncertainty, and business disruption attended to large-scale litigation. Aframe Aff. ¶ 18.

From early August until November of 1998, Allmerica engaged in extensive, substantive negotiations with Lead Counsel over the terms of a proposed settlement. Aframe Aff. ¶ 20; Anderman Aff. ¶ 23. Lengthy face-to-face negotiation sessions were conducted, with the active participation of as many as four attorneys for each side and actuarial experts. Aframe Aff. ¶ 20.

The terms negotiated by the parties pertained to the nature and forms of the relief available, the mechanics of how that relief should be administered and distributed, the scope and terms of the release, and the structure and language of the notices. Aframe Aff. ¶ 20. Numerous separate drafts of the key settlement documents were exchanged by the parties. Id.[3]

As settlement negotiations progressed, Allmerica supplemented its prior production of over three million pages by responding to requests for further data that Lead Counsel and their actuarial experts believed necessary to evaluate the merits of the proposed settlement terms. Aframe Aff. ¶ 21. The extensive discovery provided Lead Counsel with a firm understanding of the strengths and weaknesses of the plaintiffs' case and, also, allowed them to properly assess the value of the settlement's terms. Anderman Aff. ¶¶ 19–20.

On November 12, 1998, the negotiations culminated with the execution by Lead Counsel and Allmerica of the Stipulation. Aframe Aff. ¶ 22. Only after reaching agreement regarding *all* of the terms of the Settlement Agreement did the parties begin to negotiate plaintiffs' attorneys' fees and expenses. *Id.;* Anderman Aff. ¶ 27.

### E. The November 24, 1998, Hearing and Order

The Court conducted a hearing on November 24, 1998, by telephone conference to consider plaintiffs' motion that it, *inter alia,* direct issuance of notice and schedule a hearing on the fairness of the Settlement. At the hearing, the Court entertained oral argument on the nature and extent of the Settlement, the relief proposed thereunder, and the parties' proposal for the implementation and administration of its terms.

Following the hearing, the Court issued its Findings and Order Certifying a Class for Settlement Purposes, Appointing Lead Counsel for the Class, Directing the Issuance of a Class Notice to the Class and Scheduling a Fairness Hearing ("Hearing Order"), *inter alia:*

- designating the named plaintiffs of the Complaint as representatives of the Class, designating the law firms of Fleming, Hovenkamp & Grayson, P.C.[4], LeBlanc Maples and Waddell, LLC, and Berman, DeValerio & Pease LLP as Lead Counsel for the Class for purposes of the settlement of this lawsuit;

- certifying the Class on a preliminary basis under Federal Rule of Civil Procedure 23(b)(3) for the purposes of settlement;

---

**3.** In addition to the Stipulation itself, the parties negotiated the terms of more than 25 other documents necessary for the implementation of the proposed settlement, including the forms of the notice to be provided to Class

members and the procedures for the ADR process. *See* Stipulation Exs. A–H.

**4.** Now George Fleming & Associates P.C.

- finding that the proposed settlement warranted notice to the Class members and a full hearing on the settlement;

- scheduling a final hearing on the proposed settlement for March 19, 1999, and setting a briefing schedule for the parties' submissions;

- directing the forms and methods of notice to the Class of the action and of the proposed settlement and finding that such notice is the best practicable notice under the circumstances;

- authorizing the Company to communicate with Class members regarding the action and the terms of the proposed settlement (subject to certain monitoring by Lead Counsel) and to engage in any other communications within the normal course of business;

- authorizing the Company's appointment of one or more Class action administrators;

- setting forth procedures whereby Class members could exclude themselves from the Class, object to the proposed Settlement, and file appearances; and

- preliminarily enjoining all Class members who do not timely exclude themselves from the Class from filing, commencing, prosecuting, intervening in, or participating as Class members in, any lawsuit (including but not limited to any Class action on behalf of Class members who do not exclude themselves) in any jurisdiction based on or relating to the claims and causes of action or the facts and circumstances relating thereto in this action and/or the Released Transactions (as that term is defined in the Settlement Agreement).

### F. Notice to Class

In accordance with the Hearing Order, a third-party administrator ("Rust"), retained by Allmerica and monitored by Lead Counsel, mailed approximately 312,-000 copies of the Court-approved notice of the Class action and proposed settlement by first class mail to current and former policyowners. Dahl Aff. ¶ 4.

On December 21 and 22, 1998, Rust published the court-approved summary notice in *The Wall Street Journal* (national edition), *USA Today,* and the newspaper of largest circulation in each of the 50 states and Puerto Rico with a combined circulation of approximately 17 million. Dahl Aff. ¶ 8.

Since July 20, 1998, Rust has operated, and Lead Counsel has monitored, a toll-free telephone bank to field and respond to policyowner inquiries regarding the action and the proposed settlement. Dahl Aff. ¶ 9. Trained telephone bank operators have responded to in excess of 8,600 inquiries in accordance with a compendium of hypothetical questions and answers scripted by the parties. Dahl Aff. ¶ 12.

### G. Exclusions, Objections, and Appearances

Under the Hearing Order, requests by Class members for exclusion from the Class needed to be postmarked, and objections to the terms of the proposed settlement and notices to appear at the fairness hearing needed to be filed, on or before February 17, 1999. In accordance with a protocol negotiated by the parties, Rust received requests for exclusion and objections at a dedicated post office box and inventoried and forwarded the materials to the Court. Dahl Aff. ¶ 11.

Only 488 of the approximately 431,000 policies covered by the settlement are the subject of requests by Class members to be excluded from the settlement. Dahl Supp.Aff. ¶ 4. Only thirteen policyowners, accounting for approximately .003% of the Class Period policies, have filed timely written objections to the proposed settlement. *Id.* at ¶ 5. No Class members have filed notices to appear at the Court's fairness hearing. *Id.* at ¶ 6.

### H. The Fairness Hearing

In accordance with the Hearing Order, the parties filed extensive legal memoranda, supported by affidavits and expert testimony, with the Court in advance of the Fairness Hearing. On March 19, 1999, the Court conducted a hearing regarding the fairness, adequacy and reasonableness of the Settlement.

## II. Jurisdiction and Notice

### A. Subject Matter Jurisdiction

■ The Court exercises jurisdiction over the state law claims contained in the Complaint under its diversity jurisdiction conferred by 28 U.S.C. § 1332. Specifically, (i) complete diversity of citizenship exists between each of the named plaintiffs who reside in Louisiana and Allmerica which maintains its principal place of business and "center of corporate activity" in Worcester, Massachusetts, and (ii) the plaintiffs have alleged that the amount in controversy exceeds $75,000. See Duhaime, 177 F.R.D. at 60 (citing Snyder v. Harris, 394 U.S. 332, 340, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969)) ("[i]n a class action, § 1332's requirement of complete diversity applies only to the named plaintiffs and the named defendants"); Coventry Sewage Associates v. Dworkin Realty Co., 71 F.3d 1, 6 (1st Cir.1995) ("unless the law provides otherwise, the plaintiff's damages claim will control the amount in controversy for jurisdictional purposes if it is made in 'good faith' ").

[2] Furthermore, this Court has original subject matter jurisdiction over the plaintiffs' allegation that Allmerica violated the federal Truth In Lending Act ("TILA") in that the claim involves a federal question. See 28 U.S.C. § 1331. With federal question jurisdiction established, this Court is also entitled to exercise supplemental jurisdiction over the balance of the Complaint because plaintiffs' TILA claim and various state law claims (e.g., tort, contract) arise from the same alleged "plan, scheme and common course of conduct" during the Class Period. See 28 U.S.C. § 1367; see also United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); Brown v. Trustees of Boston University, 891 F.2d 337, 356 (1st Cir.1989).

### B. Personal Jurisdiction

■ The Court exercises personal jurisdiction over out-of-state members of the Class because the Court and the parties have safeguarded their right to due process. See Phillips Petroleum v. Shutts, 472 U.S. 797, 812, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985); Duhaime v. John Hancock Mut. Life Ins. Co., 177 F.R.D. 54, 60 (D.Mass.1997). In making this ruling, the Court specifically finds that the Class members have been provided with the "best notice practicable under the circumstances, including notice to all members who can be identified through reasonable effort," as well as the other protections set forth in Federal Rule of Civil Procedure 23(c)(2).[5] The Court also notes the testimony of Professor George Priest of Yale Law School who, based on his experience reviewing the notice campaigns in other class action litigation, found that the one undertaken in this action provided class members with a firm basis upon which to determine whether to participate in the Settlement, to request exclusion from the class, or to object. See Priest Aff. ¶ 19.

In addition to the clarity and comprehensiveness of the notice materials, the Court notes that, with respect to the distribution of the notice by first class mail, only 21,698 of the notice packages, less than 7 percent of the total mailed, were undeliverable. Dahl Aff. ¶ 5. The parties also published a summary notice in The Wall Street Journal, USA Today, and the news-

---

5. The Court already has found in its Hearing Order that the Class notice package distributed by first class mail, as well as that published in various local and national newspapers, satisfies the requirements of due process.

paper of highest circulation in each of the 50 states and Puerto Rico. Dahl Aff. ¶ 8.

Finally, the parties operate a toll-free telephone bank to answer Class members' questions, providing each Class member with further information upon which to decide whether he or she should remain in the Class, request exclusion, object to the Settlement, or appear before the Court at the fairness hearing. The Court finds that this additional effort—not required by any statute or court rule—significantly enhanced the effectiveness of the written notice materials because it was a cost-free and convenient resource to those who wanted to learn more before making important decisions about their rights.

### III. Class Certification

Before addressing whether the settlement is fair, adequate and reasonable, this Court must certify the class. To be certified, the class must meet the requirements of Fed.R.Civ.P. 23(a) and 23(b)(3).

In its Hearing Order, this Court preliminarily certified the Class as defined *supra*. Having revisited the issue, and reconsidered the plaintiffs' memoranda and testimony on this issue, the Court again concludes the Class should be certified under Federal Rule of Civil Procedure 23(b)(3). *See Duhaime*, 177 F.R.D. at 65.

#### A. Rule 23(a) requirements

Fed.R.Civ.P. 23(a) [6] sets forth four prerequisites: numerosity, commonality, typicality, and adequacy of representation.

#### 1. Numerosity

■ The class must be so numerous that "joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). Here, the Class consists of in excess of 300,000 former and present Allmerica customers who have owned over 430,000 policies. Thus, this Court finds the numerosity requirement to be satisfied. *See, e.g., Guckenberger v. Boston Univ.*, 957 F.Supp. 306, 325 (D.Mass.1997) (holding class size of 480 members to be sufficiently numerous to satisfy Rule 23).

#### 2. Commonality

■ The Court finds that this action involves a litany of "questions of law or fact common to the Class." Fed.R.Civ.P. 23(a)(2); *see In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F.Supp. 450, 511 (D.N.J.1997), *aff'd*, 148 F.3d 283 (3rd Cir.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 890, 142 L.Ed.2d 789 (1999). In particular, the plaintiffs have identified, and the Court concurs that the Complaint presents, *inter alia*, the following common questions of law and fact:

- Whether Allmerica, directly and through its nationwide sales force, devised and implemented a scheme or artifice to defraud or engage in a common course of business which acted to defraud or deceive plaintiffs and the Class in the sale of its life insurance policies;

- Whether Allmerica failed to properly supervise and/or train its agents and/or failed to prevent their violation of applicable laws;

- Whether Allmerica, directly and through its nationwide sales force, engaged in deceptive acts and practices in the selling of its life insurance policies by representing through policy illustrations, marketing materials and uniform sales presentations and information prepared by the company or its agents, that the single payment of premiums made by Class members at the

---

**6.** Fed.R.Civ.P. 23(a) provides:

One or more members of a class may sue or be sued as the representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

time of purchase, or the payment of a certain number of premiums during a fixed period of years, would be sufficient to carry the cost of the policies for the lives of the insureds for many years into the future as represented and projected;

• Whether Allmerica, directly and through its sales force, concealed at the time of sale and thereafter the number of out-of-pocket premium payments that a policyholder would actually have to pay and the cash values, surrender values and other benefits that a policyholder would actually realize based on a particular number or amount of cash premium payments;

• Whether Allmerica failed to disclose or adequately caution plaintiffs and other Class members that the returns payable as presented in its policy illustrations or other sales presentations were not guaranteed at the promised levels, and would likely decrease in future policy years;

• Whether the uniform sales materials provided and representations made to plaintiffs and the other Class members contained false and misleading statements or omitted material facts relating to projected interest rates, premiums, cash values, death benefits, and income payable;

• Whether the interest rate projections and other assumptions underlying Allmerica's policy illustrations and sales representations lacked any reasonable basis and/or were so flawed as to have an adverse impact on plaintiffs and other Class members;

• Whether Allmerica failed to disclose that the dividend scales or interest crediting rates depicted in policy illustrations and sales presentations were based on assumptions which could not be maintained or sustained over the long periods of time being projected;

• Whether Allmerica, directly and through its sales force, concealed at the time of sale and thereafter that plaintiffs and other Class members derived no true benefit from the replacement of their existing life insurance policies, and that such sales would result in: (a) substantial financial and contractual detriment to the policyholders; (b) significant financial benefit to Allmerica agents, in the form of large commissions on the first year premiums and thereafter; and (c) significant financial and contractual benefits to Allmerica, including but not limited to, sales loads or other administrative charges;

• Whether the acts alleged in the complaint constitute violations of the Truth in Lending Act, and the regulations promulgated thereunder; and

• Whether Allmerica sold life insurance policies as savings or investment plans, knowing that the overriding purpose for purchasing life insurance is to obtain the protection of the death benefit.

### 3. Typicality

■■ The typicality inquiry hinges on the extent to which "named plaintiffs' claims 'arise from the same course of conduct that gave rise to the claims of the absent [class] members'". *Duhaime,* 177 F.R.D. at 63 (quoting *Burstein v. Applied Extrusion Technologies, Inc.,* 153 F.R.D. 488, 491 (D.Mass.1994)). This Court finds that "the claims or defenses of the representative parties are typical of the claims or defenses of the Class." Fed.R.Civ.P. 23(a)(3).

In particular, the Court finds that the individual claims and circumstances of the named plaintiffs, described *supra,* are typical of the claims of the Class insofar as the "injuries arise from the same events or course of conduct as do the injuries that form the basis of the Class claims." *Guckenberger,* 957 F.Supp. at 325 (quotation omitted); *see also In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 962 F.Supp. at 518 (holding typicality require-

ment satisfied in market conduct Class action alleging similar claims because insurer's alleged scheme to defraud was "predominant guiding thread to all of the plaintiffs' claims").

### 4. Adequacy of Representation

■ This Court finds that the representative plaintiffs have "fairly and adequately protect[ed] the interests of the Class." Fed.R.Civ.P. 23(a)(4); *see Amchem*, 117 S.Ct. at 2234 (adequacy requirement "serves to uncover conflicts of interest between named parties and the Class they seek to represent"). According to the Complaint, the named plaintiffs, like the Class overall, fell victim to Allmerica's alleged scheme and, as such, the representatives and the Class share the same interest in seeking remediation for their injury. *See* Anderman Aff. ¶ 32; *see also General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 156, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982).

In addition, throughout this litigation the named plaintiffs have been represented by Lead Counsel, who the Court concludes adequately represented the interests of the Class. *See Cullen v. New York State Civil Serv. Comm'n.*, 566 F.2d 846, 848–49 (2d Cir.1977) (adequacy of counsel central to finding of adequacy of representation); *see also Duhaime*, 177 F.R.D. at 64.

### B. Rule 23(b)(3) Requirements

Fed.R.Civ.P. 23(b)(3) imposes two additional requirements for certification: (1) common questions of law or fact must predominate over individual questions, and (2) the class action must be superior to other means of adjudication.

### 1. Predominance

■ The Court finds that the questions of law or fact common to all Class members (described *supra*) "predominate over any questions affecting only individual Class members." Fed.R.Civ.P. 23(b)(3). In particular, the central questions presented by this case are common to all Class members and, notwithstanding the existence of individual questions (*e.g.*, damages, reliance), it is apparent from the pleadings that the common questions predominate. *See Duhaime*, 177 F.R.D. at 64 (citing *In re Am. Continental Corp.*, 140 F.R.D. 425, 427 (D.Ariz.1992)) (differences in oral sales presentations do not defeat predominance because allegations describe nationwide course of conduct); *General Tel. Co. of Southwest* 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982) ("[s]ometimes the issues are plain enough from the pleadings to determine whether the interests of the absent parties are fairly encompassed within the named plaintiff's claim"); *see also In re School Asbestos Litig.*, 789 F.2d 996, 1010 (3rd Cir.) (even a few common issues may satisfy predominance requirement if resolution of issues "will so advance the litigation that they may fairly be said to predominate"), *cert. denied*, 479 U.S. 852, 107 S.Ct. 182, 93 L.Ed.2d 117 (1986).

■ Potential choice of law issues do not preclude a predominance finding. *See Elkins v. Equitable Life Insurance of Iowa*, 1998 WL 133741 (M.D.Fla.1998) at *17 ("Predominance is not undermined by any theoretical choice of law issues that might also arise if this case were to be litigated."). In addition, the Court credits the testimony of one of the plaintiffs' experts, Professor Samuel Issacharoff of Texas Law School, who concluded, *inter alia*, that any variations of law that might have applied to certain of the plaintiffs' state law claims would neither compromise the capacity of counsel to prosecute the claims on behalf of the Class or defeat the predominance required by Rule 23(b)(3). *See* Issacharoff Aff. ¶¶ 30–33.

### 2. Superiority

■ The Court finds that for this case "a Class action is superior to other available methods for the fair and efficient

adjudication of the controversy." Fed. R.Civ.P. 23(b)(3). Rule 23(b)(3) lists four nonexclusive factors relevant to the superiority inquiry:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Looking at these factors, the Court finds that the individual members of the Class have relatively little interest in conducting separate lawsuits, as evidenced by the fact that so few have excluded themselves from the litigation. The Court also finds that it is in the interests of the Class and justice to have all claims concerning Allmerica's alleged wrongdoing resolved in one forum and, further, that the District of Massachusetts is a particularly appropriate venue given that it is the location of Allmerica's principal place of business. *See, e.g., In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F.Supp. at 524.

With respect to the fourth factor, this Court, deciding whether to certify a settlement-only class, "need not inquire whether the case, if tried, would present intractable management problems," *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 2248, 138 L.Ed.2d 689 (1997). Thus, this Court refrains from addressing this manageability issue here.

Thus, as detailed above, the Class is certified as it satisfies the requirements of Rule 23.

## IV. Analysis of Settlement Agreement

Federal Rule of Civil Procedure 23(e) requires the Court to determine whether the proposed settlement's "terms are fair, reasonable and adequate." *Duhaime*, 177 F.R.D. at 67. This requires the Court to consider both the substantive terms of the settlement compared to the likely result of the trial and "the negotiating process by which the settlement was reached." *Id.* citing *Weinberger v. Kendrick*, 698 F.2d 61, 69 (2d Cir.1982).

This fairness determination is not based on a single inflexible litmus test but, instead, reflects its studied review of a wide variety of factors bearing on the central question of whether the settlement is reasonable in light of the uncertainty of litigation. *See M. Berenson Co. v. Faneuil Hall Marketplace, Inc.*, 671 F.Supp. 819, 822–23 (D.Mass.1987); *Duhaime*, 177 F.R.D. at 68 (citing *Santana v. Collazo*, 714 F.2d 1172, 1175 (1st Cir.1983)).

### A. The Settlement Structure

The settlement offers the Class a valuable package of relief patterned in certain respects after other approved settlements in sales practice Class actions involving other life insurers. *See, e.g., Elkins v. Equitable Life Ins. Co.*, C.A. No. 96–296–CIVB–RT–17B, 1998 U.S.Dist. LEXIS 1557 (M.D.Fla. Jan. 27 1998); *Duhaime*, 177 F.R.D. at 54; *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F.Supp. at 450; *Willson v. New York Life Ins. Co.*, No. 94/127804, 1995 N.Y.Misc. LEXIS 652 (Sup.Ct. Nov. 8, 1995), *aff'd*, 228 A.D.2d 368, 644 N.Y.S.2d 617 (1996); *Michels v. Phoenix Home Life Mut. Ins. Co.*, No. 5318–95, 1997 N.Y.Misc. LEXIS 171 (Sup.Ct. Jan. 3, 1997).

In particular, the Settlement Agreement provides all Class members with the right to choose between two categories of relief: (*i*) the ADR Process (an opportunity for those who believe they were misled or otherwise injured in connection with their life insurance policy to submit an individual claim for cost-free, neutral adjudication in accordance with specified criteria), and (*ii*) General Policy Relief ("GPR") (a selection of benefit options tailored to fit Class members' individual circumstances and preferences that is available without

demonstrating fault by Allmerica or a showing of injury by the Class members).

Although the Court addresses the specifics of the proposed relief *infra*, it notes as a threshold matter that the structure of the relief, and in particular the array of benefits available to the Class, reflects a creative and flexible resolution of this Action. *See Duhaime*, 177 F.R.D. at 69; *In re Prudential Ins. of Am. Sales Practices, Litig.*, 962 F.Supp. at 535.

### 1. Alternative Dispute Resolution

The Alternative Dispute Resolution ("ADR") Process set forth at part 4 of the Stipulation enables any Class member who believes that he or she was misled or otherwise injured in connection with his or her policy to submit a claim for relief to an individualized process administered and paid for by Allmerica. Those Class members who elect ADR ("Claimants") will complete a claim form to describe the circumstances under which the policies were purchased, submit relevant documentation, and will have the opportunity to submit declarations of other individuals with personal knowledge of the transaction(s) at issue. For its part, the Company will collect relevant materials from its own files and those of its agencies and request that the agent who sold the policy at issue complete a form, which, like the claim form, will describe the circumstances under which the policy was sold.

The materials submitted by Claimants and collected by Allmerica will be assembled for review by a pool of Neutral Claims Adjudicators ("Neutrals") selected jointly by the parties.[7] The Neutrals will review the claims in accordance with specified, objective scoring criteria (set forth in Exhibit A to the Stipulation), assigning each claim a score ranging from 0 (which will result in no relief being awarded) to 4 (which will result in an award of relief

designed to provide the Claimant with the benefit of his or her bargain or appropriate rescissory relief).

The Court finds that the ADR Process will provide all Class members with access to a valuable, fair, essentially cost-free and simple mechanism for resolving all claims covered by the Settlement. *See Duhaime*, 177 F.R.D. at 69 ("[t]he ADR process thus creates opportunities for relief and recovery that may be superior to those which would otherwise be available"); *Willson v. New York Life Ins. Co.*, 1995 N.Y.Misc. LEXIS 652, at *85 (ADR provides "an innovative solution to the manageability and fairness issues posed by many Class actions"); *Michels v. Phoenix Home Life Mut. Ins. Co.*, 1997 N.Y.Misc. LEXIS 171, at ** 78, 80, 81 ("[t]he availability of this ADR Process ... is a substantial benefit to the Class"). In making this finding, the Court has, *inter alia*, taken into account the following:

First, under the scoring and relief guidelines developed by the parties, Claimants will be able to obtain relief even where they otherwise would not be able to prove each element of a particular legal theory or where that claim might otherwise be barred by a dispositive legal defense, such as the statute of limitations or the parol evidence rule. *See* Priest Aff. ¶¶ 14, 25.

Second, the ADR Process allows *all* Class members to establish their entitlement to individual relief promptly and to avoid the substantial costs, risks, and delay of litigating issues of Class liability. *See id.* at ¶ 25.

Third, Class members who prevail on their ADR claims will receive valuable relief which is tailored to the nature of their grievance and, where supported by sufficient evidence, is designed to approximate the benefit of their bargain.[8] The Court

---

7. The parties have represented that they anticipate the majority of the Neutrals will be retired or former members of the judiciary or qualified attorneys.

8. For example, a "vanishing premium" Claimant with an in-force policy who demonstrates that he or she was guaranteed a paid up policy in exchange for a fixed number of

credits the testimony of Professor Priest that such relief offers "ideal restitution" and that "those with the most meritorious claims may receive a remedy better than common law restitution since legal representation and related expenses that the Class member would incur in an individual law suit are provided at Defendant's expense." Priest Aff. ¶ 25.

Fourth, Allmerica is required to compensate all successful Claimants in the ADR Process regardless of the aggregate value of their claims. That is, each claim is adjudicated on its objective merits and awarded relief that not only reflects the nature and strength of the claim but also is untethered to the volume, nature, and relative strength of the other claims that have been adjudicated. *See Elkins*, 1998 U.S.Dist. LEXIS 1557, at *97 (approving settlement by life insurer of market conduct Class action where, *inter alia*, there was "no cap on the aggregate value of the relief to be afforded claimants in the Claim Review Process") (quotation omitted); *see also Michels*, 1997 N.Y.Misc. LEXIS 171, at ** 80–81 (similar).

Fifth, the ADR Process is "user friendly" insofar as Class members need not fill out complex or excessive forms, need not attend a hearing or submit legal memoranda, and can expect a relatively quick adjudication by Neutrals familiar with the legal claims and products at issue.

Sixth, the remedies set forth at part 8 of the Stipulation provide a mechanism for resolving any otherwise unaddressed grievances Class members may have with Allmerica or their policies.

In addition, the very availability of the ADR Process confers a substantial benefit on individual Class members. The Court notes (but does not find dispositive in view of the dependance of the Class's aggregate ADR relief on the volume and nature of the claims submitted) the projection of the plaintiffs' actuarial expert that the aggregate value of the relief likely to be realized through the ADR Process is in excess of $48 million. *See* Hoyer Aff. ¶ 9.

### 2. General Policy Relief

The General Policy Relief ("GPR") set forth at part 5 of the Stipulation offers each Class member who chooses not to submit a claim to the ADR Process an opportunity to obtain—without a showing of fault or damages—an array of relief options:

- *Enhanced Policies.* Class members have an opportunity to purchase a currently issued form of whole life, universal life or variable universal life insurance policy with a substantial discount applied to the first-year premium.

- *Enhanced Annuity.* Class members have an opportunity to purchase an Enhanced Annuity. The Enhanced Annuity is a currently issued non-qualified deferred variable annuity featuring a contribution from Allmerica and liberalized surrender charges.

The Court finds that the GPR, like the ADR Process, will confer benefits that are adaptable to the circumstances of individual Class members by assisting them to meet their original insurance and/or financial planning objectives. *See* Priest Aff. ¶ 27 (observing that GPR "serves restitutionary ends"); *see also Michels*, 1997 N.Y.Misc. LEXIS 171, at *82 (approving settlement of insurance sales practices Class action where, *inter alia*, GPR was "tailored to meet allegations of the Complaint and the specific insurance and investment needs of the Class Members").

The value of the General Policy Relief is further enhanced by the ability of a Class member to transfer to a member of his or her family the right to purchase an Enhanced product. *See* Priest Aff. ¶ 27 (op-

premiums may receive payment by the Company of any premiums beyond those originally represented as needed to maintain that prom-

ised coverage. *See* Stipulation, Ex. A at 15–19.

portunity to transfer settlement benefits "is a particularly appropriate remedy to those Class members who purchased insurance policies to protect the financial positions of their families"); *see also New York v. Nintendo of Am., Inc.*, 775 F.Supp. 676, 681–82 (S.D.N.Y.1991); *In re Cuisinart Food Processor Antitrust Litig.*, 1983 WL 153, at *4 (D.Conn. Oct.24, 1983).

The Court also notes (but does not find dispositive in view of the dependence of the Class's aggregate GPR relief on the volume and nature of the benefits requested) the testimony of the actuarial firm Milliman & Robertson ("M & R"), which has estimated that the aggregate value likely to be realized as General Policy Relief is approximately $60.8 million. *See* M & R Report at 3 (appended as Exhibit A to Perrott Aff.).

### B. Allmerica is Responsible for the Transactional Expense of the Settlements.

This Court notes the past and anticipated expenditure of approximately $20.4 million for the cost of providing notice to the Class, administering the settlement, setting up and maintaining the ADR Process, and administering the distribution of General Policy Relief.[9] *See* Aframe Aff. ¶ 23. *See, e.g., Michels*, 1997 N.Y.Misc. LEXIS 171, at *78 (approving settlement of insurance sales practices Class actions, court noted defendant's payment of "administrative expenses for the benefit of the Class").

### C. The Settlement Addresses the Class's Allegations.

In addition, the Court finds the settlement to be fair and reasonable because the relief provided thereunder—either through the ADR Process or the provision of General Policy Relief—is tailored to remediate the alleged wrongdoing as set forth in the Complaint. Specifically, the ADR Process will provide valuable relief that, depending on the nature and strength of the claim, corresponds directly to the facts alleged and harm shown with, as noted *supra*, the most deserving Class members recovering the benefit of their bargain undiluted by the delay and expense typical of individual litigation. Similarly, the benefits provided as General Policy Relief are designed to address concerns raised by the circumstances described in the Complaint. *See* Priest Aff. ¶ 29 (noting "close relationship between the ultimate remedy of the settlement and the original claims of the litigation").

### D. The Settlement Treats All Class Members Fairly.

The Court finds that the settlement benefits are fairly distributed among the Class. As noted *supra*, the relief available to a given Class member is determined in accordance with objective criteria and, importantly, is neither limited nor enhanced by the value of that awarded to another Class member, or by the number of Class members who ultimately participate in the Settlement. *See* M & R Report at 38 ("the benefits are fairly and equitably distributed").

The Court also finds that any differences in the nature and value of the benefits received by Class members reflect the Settlement's fairness insofar as they are rationally based on objective differences in the positions of the Class members, such as the kind and size of their insurance policy, their status as a current or terminated policyowner, and, with respect to those participating in the ADR Process, the nature and relative strength of their claim. *See* M & R Report at 38; *see also SEC v. Certain Unknown Purchasers*, 817 F.2d 1018, 1020–21 (2d Cir.1987) (affirming approval of securities Class action settlement which provided individual compensation only to Class members with out-of-pocket losses), *cert. denied*, 484 U.S. 1060,

---

9. In its evaluation of the requested attorneys' fee award, this Court, consistent with the affidavit of class counsel Jody E. Anderman, does not consider these administrative expenses to enhance the value of the settlement to the Class.

108 S.Ct. 1013, 98 L.Ed.2d 979 (1988); *Cohen v. RTC,* 61 F.3d 725, 728 (9th Cir. 1995) (provision of different benefits to different Class members permissible where settlement terms are "rationally based on legitimate considerations") (citation omitted), *vacated on other grounds,* 72 F.3d 686 (9th Cir.1996); *Officers for Justice v. Civil Serv. Com.,* 688 F.2d 615, 629 (9th Cir.1982) (affirming approval of settlement providing different relief to differently situated Class members), *cert. denied,* 459 U.S. 1217, 103 S.Ct. 1219, 75 L.Ed.2d 456 (1983); *M. Berenson Co.,* 671 F.Supp. at 824 (approving settlement which treated Class members differently where such treatment was "reasonable and appropriate, and fairly reflect[ed] the reality of the business situation presented by [the] lawsuit").

## E. *Potentially Significant Obstacles to Recovery at Trial*

The very real risk that the Class would not recover if this Action proceeded to trial also supports approval of the settlement because "[b]asic to the [fairness] inquiry is the need to compare the terms of the compromise with the likely rewards of litigation." *See In re Asbestos Litig.,* 129 B.R. 710, 852 (S.D.N.Y.1991) (quoting *Weinberger,* 698 F.2d at 73); *see also In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 148 F.3d at 319 (affirming trial court's approval of insurance sales practices Class action settlement where "plaintiffs would face a difficult burden at trial" in light of defendants' defenses); *Duhaime,* 177 F.R.D. at 68–69 (approving settlement of insurance sales practices Class action where plaintiffs "face[d] substantial obstacles to success if litigation were to proceed" and where "plaintiffs' recovery after trial is far from assured").

More particularly, Allmerica has provided an extensive list of its legal defenses (*e.g.,* statutes of limitation, parol evidence rule, economic loss doctrine), any one of which, if successful, could result in entry of a judgment *with prejudice* against the Class. *See* Defendant's Memorandum in Support of Class Action Settlement at 36–38; *accord* Plaintiffs' Memorandum in Support of their Motion for Approval of the Settlement and Certification of the Class at 21–22.

■ In evaluating the fairness of the Settlement, the Court does not rule on the merits of either the Class's claims or Allmerica's multiple defenses. *See, e.g., I.U.E. v. Unisys,* 858 F.Supp. 1243, 1266 (E.D.N.Y.1994) (approval of settlement does not require adjudication of merits). However, the reality that the Class would encounter significant, and potentially insurmountable, obstacles to a litigated recovery underscores the reasonableness of the compromise set forth in the Settlement Agreement. *See* Priest Aff. at ¶ 24 (availability of "ideal restitution" through the ADR Process "appear[s] not fully adjusted to reflect the defenses that would be available to the Defendants in the context of litigation"); *see also Duhaime,* 177 F.R.D. at 69 (noting that settlement provides arguably superior relief to that available through litigation insofar as Class members may proceed to ADR "even where they might not be able to prove all of the legal elements of [their] claim or where that claim might otherwise be barred by a defense").

## F. *Impracticability of Continued Litigation*

■ This action concerns the sale of every whole life, universal life and variable universal life insurance policy sold by the Company over a twenty-year period and the performance of those policies after the time of sale. The Court accepts the parties' representation that the trial of the Class's claims would require years of further preparation, would be a lengthy proceeding and would require technically sophisticated actuarial and financial expert testimony. The impracticality of such an exercise—particularly in light of the possibility that the Class would walk away with nothing—is an additional basis upon which

the Court finds the settlement to be fair, reasonable and adequate. *See, e.g., Elkins,* 1998 U.S.Dist. LEXIS 1557, at *80; *In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 962 F.Supp. at 536; *see also Lake v. First Nationwide Bk.,* 900 F.Supp. 726, 732–33 (E.D.Pa.1995); *Burka v. New York City Transit Auth.,* 129 F.R.D. 80, 83 (S.D.N.Y.1990); *In re Painewebber Limited Partnerships Litig.,* 171 F.R.D. 104, 125 (S.D.N.Y.1997).

## G. Extensive Discovery Prior to Reaching Settlement

The parties' enormous discovery effort (described *supra* ) enabled Lead Counsel to assess the merits of the Class's litigation position and, in turn, to negotiate a principled compromise. The Court finds that this extensive discovery, and also Lead Counsel's retention of expert consultants, is probative of the Settlement's fairness. *See, e.g., In re Painewebber Limited Partnerships Litig.,* 171 F.R.D. at 126; *Unisys,* 858 F.Supp. at 1265; *M. Berenson Co.,* 671 F.Supp. at 822.

## H. Arms' Length Negotiations

The Court finds that the settlement negotiations (described *supra* ) were conducted at arms' length over several months and therefore support "a strong initial presumption" of the Settlement's substantive fairness. *See In re Painewebber Limited Partnerships Litig.,* 171 F.R.D. at 125; *see also M. Berenson Co.,* 671 F.Supp. at 822.

[20] Finally, the assurances of the parties that they did not address the issue of Lead Counsel's remuneration until after reaching consensus on the terms of the Settlement also suggests that the settlement process was fair. *See, e.g., Duhaime,* 177 F.R.D. at 67 (approving settlement of insurance sales practices Class action where "attorneys' fees were negotiated after and separate from the proposed settlement").

## I. Counsel Believe that the Proposed Settlement is Fair.

The Court's fairness determination also reflects the weight it has placed on the judgment of the parties' respective counsel, who are experienced attorneys and have represented to the Court that they believe the settlement provides to the Class relief that is fair, reasonable and adequate. *See, e.g., In re Painewebber Limited Partnerships Litig.,* 171 F.R.D. at 125; *Unisys,* 858 F.Supp. at 1265 (citing *Weinberger,* 698 F.2d at 75–76).

## J. Objections and Requests for Exclusion

The number of requests for exclusion from the settlement, as well as the number and substance of objections filed, is relevant to this Court's analysis of the settlement. *See In re Painewebber Partnerships Litig.,* 171 F.R.D. at 106 (noting that favorable reaction of class to settlement, albeit not dispositive, constitutes strong evidence of fairness of proposed settlement and supports judicial approval).

As of January 22, 1999, only 144 letters from Class members requesting to be excluded from the settlement were received, accounting for .05% of the Class. Dahl Aff. ¶ 14. Looking to the objections filed, this Court notes that thirteen Class Members have timely objected to the terms of the Settlement, accounting for approximately .003% of the Class Period policies. Dahl Supp.Aff. ¶ 5. Not a single Class member filed a notice to appear at the fairness hearing.

Although this Court considers the number of objections to be *de minimis* relative to the settlement, it has carefully reviewed the objectors' stated concerns generously, as it would those presented by any *pro se* litigant. Detailed below is this Court's examination of those objections, except for the question of attorneys' fees. As those fees "do not have a direct effect on the fairness of the settlement itself", *Duhaime,* 177 F.R.D. at 71, this Court

addresses the award of attorneys' fees in a separate memorandum.

As detailed below, this Court considers the substance of the objections to be without merit, except for the question of attorneys' fees, which this Court addresses in a separate memorandum. In arriving at this conclusion, the Court notes the following:

Many of the objectors' stated grievances with the proposed General Policy Relief are misplaced because they are based on the misconception that GPR is the only form of relief available under the Settlement. Instead, the Court notes that the ADR Process offers Class members a generous opportunity to seek redress for their alleged losses. As Professor George Priest of Yale Law School has observed, ADR is

a remedy better than common law restitution since legal representation and related expenses that the class member would incur in an individual lawsuit are provided at the Defendants' expense.

Priest Aff. ¶ 25.

To the extent the objections to the General Policy Relief are based on the fact that GPR only provides so-called purchase remedies (whereby the receipt of relief is contingent upon the purchase of an additional Allmerica product), this Court notes that the ADR Process (available to both existing and terminated Allmerica policyowners) is not a purchase remedy.

Finally, the objections are without merit to the extent they assert that the settlement will benefit Allmerica because that complaint ignores the cost to the Company and is irrelevant to the question of whether the settlement is fair and adequate in regard to the relief it affords to the Class.

Thus, it is the opinion of this Court that the substance of the above objections are without merit and do not undermine this Court's conclusion that the settlement is fair, adequate and reasonable.

## V. Conclusion

For the reasons stated above, this Court finds that the settlement is fair, adequate and reasonable and determines that the Class should be certified and the Settlement approved. This Court has issued with this Memorandum a Final Order and Judgment approving the settlement and dismissing with prejudice the claims in this Action in accordance with the Settlement Agreement. Class counsel's request for an award of attorneys' fees will be addressed in a separate opinion.

## FINAL ORDER AND JUDGMENT

WHEREAS, Victor Bussie, Morley Morgana, Quentin Dawson and Margaret Dawson filed a second amended putative class action complaint captioned *Victor Bussie, Morley Morgana, Quentin Dawson and Margaret Dawson, individually and as representatives of all others similarly situated v. Allmerica Financial Corporation, SMA Financial Corporation, First Allmerica Financial Life Insurance Company, and Allmerica Life Insurance and Annuity Company,* C.A. No. 97–40204 in the United States District Court for the District of Massachusetts, on November 16, 1998 (the "Action"); and

WHEREAS, the parties and their attorneys have undertaken extensive discovery, including the production to the plaintiffs of in excess of three million pages of written discovery and 1.2 megabytes of computer data, the deposition of 15 witnesses (including key company personnel and each named plaintiff), and the retention of experts familiar with actuarial principles and insurance policy mechanics; and

WHEREAS, counsel for plaintiffs and defendants (collectively "Allmerica" or the "Company"), engaged in arm's length negotiation of a settlement of the Action to avoid the expense, uncertainties, and burden of protracted litigation, and to put to rest any and all claims or causes of action that have been, or could have been, asserted against Allmerica in the Action by the

plaintiffs and/or other members of the putative class; and

WHEREAS, the parties and their attorneys have entered into a Stipulation of Settlement, dated November 12, 1998 ("Stipulation") in which the parties have agreed upon a settlement of the Action subject to the approval and determination of the Court as to the fairness, reasonableness and adequacy of the settlement, which, if approved, will result in dismissal of the Action with prejudice; and

WHEREAS the Court, following a hearing conducted on November 24, 1998, and on motion of the plaintiffs, entered Findings and an Order Certifying a Class for Settlement Purposes, Appointing Lead Counsel for the Class, Directing the Issuance of a Class Notice to the Class and Scheduling a Fairness Hearing ("Hearing Order"); and

WHEREAS the parties have complied with the Hearing Order; and

NOW, upon again reviewing the Stipulation and all exhibits attached thereto (collectively, the "Settlement Agreement") and all prior proceedings held herein, upon reviewing the parties' submissions in support of the settlement (including their legal memoranda and the testimony and expert testimony filed therewith), upon reviewing the objections to the Settlement Agreement filed by class members, and the matter having come before the Court for a fairness hearing on March 19, 1999, it is hereby **ORDERED, ADJUDGED AND DECREED:**

1.  This Final Order and Judgment incorporates herein and makes a part hereof the Settlement Agreement.

2.  Pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3), a class for settlement purposes is hereby finally certified (the "Class") consisting of all persons or entities who at any time up through and including May 31, 1998, had an ownership interest in one or more whole life, universal life or variable universal life insurance policies issued in the United States by Allmerica (or its predecessors or present or former affiliates or subsidiaries as set forth in the Stipulation and Exhibit C thereto) during the period January 1, 1978, through May 31, 1998 (the "Class Period") with an issue date during the Class Period, but which does not include: *(i)* current or former directors, officers, employees and Producers of the Company; or *(ii)* any individual or entity who, represented by or having consulted with an attorney, signed a document pursuant to a settlement or resolution of an actual or threatened lawsuit that releases Allmerica or its predecessors from any further claims concerning their policy or policies (unless such persons or entities are class members by virtue of their ownership interest in other policies); or *(iii)* persons or entities who timely excluded themselves from the Class pursuant to part 7 of the Stipulation and the Hearing Order. A list of those persons who have timely excluded themselves from the Class and who are therefore not bound by this Final Order and Judgment, has been filed jointly by the parties with the Court and is incorporated herein and made a part hereof.

3.  The terms and provisions of the Settlement Agreement, including all exhibits thereto, have been entered into following an arms' length negotiation and are hereby fully and finally approved as fair, reasonable and adequate as to, and in the best interests of, the Class members; and the parties and Class members are hereby directed to implement and consummate the Settlement Agreement according to its terms and provisions; *provided, however,* that Allmerica is hereby authorized, in its sole discretion and without further approval of this Court, to implement the settlement prior to the Final Settlement Date (as that term is defined in the Stipulation); and *provided further* that the parties are hereby authorized to agree to and adopt such amendments to, and modifications and expansions of, the Settlement Agreement—including, without limitation, the post-settlement notice materials and the

ADR process manual (Exhibit B to the Stipulation)—which *(i)* shall be consistent in all material respects with this Final Order and Judgment, and *(ii)* do not diminish the rights of class members.

4. The distribution of the class notice and the publication of the publication notice as provided for by, and undertaken pursuant to, the Hearing Order [1] *(i)* constituted the best practicable notice under the circumstances to Class members, *(ii)* constituted notice that was reasonably calculated, under the circumstances, to apprise Class members of the pendency of the action, their right to object or to exclude themselves from the proposed settlement and to appear at the Fairness Hearing, *(iii)* was reasonable and constituted due, adequate and sufficient notice to all persons entitled to be provided with notice, and *(iv)* fully complied with the requirements of the United States Constitution, the Federal Rules of Civil Procedure, and the Rules of the Court.

5. The parties are hereby directed to mail and publish the post-settlement notice materials substantially in the forms attached to the Stipulation. The post-settlement publication Notice shall be published as provided by Stipulation and in the newspaper with the highest circulation in each of the 50 states, the District of Columbia and Puerto Rico. The Court finds that the post-settlement notice materials and methodology set forth in the Settlement Agreement *(i)* constitute the most effective and best practicable notice of this Final Order and Judgment, the relief available to Class members pursuant to this Final Order and Judgment, and applicable time periods, *(ii)* constitute due, adequate and sufficient notice for all other purposes to all Class members, and *(iii)* fully comply with the requirements of the United States Constitution, the Federal

Rules of Civil Procedure and the Rules of the Court.

6. Lead Counsel and the Class representatives have adequately represented the Class throughout this litigation.

7. The terms of the Settlement Agreement and of this Final Order and Judgment shall be forever binding on, and shall have *res judicata* and preclusive effect in, all pending and future lawsuits or other proceedings encompassed by the Release (described and defined *infra*, ¶ 8) maintained by or on behalf of the plaintiffs and all other Class members, as well as their heirs, executors and administrators, successors and assigns.

8. The release appended hereto as Exhibit A, which also is set forth in part 9 of the Stipulation ("Release"), is expressly incorporated herein in all respects and is effective as of the date of this Final Order and Judgment.

9. The release referred to in Paragraph Eight of this Final Order and Judgment covers, without limitation, any and all claims for attorneys' fees, costs or disbursements incurred by Lead Counsel or any other counsel representing plaintiffs or Class members, or incurred by plaintiffs or the Class members, or any of them, in connection with or related in any manner to this action, the settlement of this action, the administration of such settlement and/or the Released Transactions except to the extent awarded by the Court.

10. All Class members who have not timely excluded themselves from the Class are hereby permanently and forever enjoined from *(i)* filing, commencing, prosecuting, intervening in, or participating (as class members or otherwise) in, any lawsuit in any jurisdiction based on or relating to the claims and causes of action, or the

---

1. The Hearing Order required the publication of the Notice no later than December 21, 1998. Two newspapers failed to run the Notice until December 22, 1998 due to their own error. Allmerica filed a Motion to Amend Order and Approve Publication of Class Notice, seeking the Court's approval of the issuance of the Publication Notice on December 22 in Rhode Island and Idaho, which motion was allowed at the Fairness Hearing on March 19, 1999.

facts and circumstances relating thereto, in this Action and/or the Released Transactions (as that term is defined in the Release), and from *(ii)* organizing Class members who have not been excluded from the Class into a separate class for purposes of pursuing as a purported class action any lawsuit (including by seeking to amend a pending complaint to include class allegations, or seeking class certification in a pending action) based on or relating to the claims and causes of action, or the facts and circumstances relating thereto, in this Action and/or the Released Transactions.

11. Allmerica may, in its discretion, require any Class member to resolve through the ADR process as described in the Settlement Agreement any claim that constitutes a Part 8 Claim (as that term is defined in Exhibit A to the Stipulation).

12. Nothing in this Final Order and Judgment shall preclude any action to enforce the terms of the Settlement Agreement, nor shall anything in this Final Order and Judgment preclude plaintiffs or Class members from seeking relief in accordance with and subject to the terms of the Settlement Agreement.

13. The Court has personal jurisdiction over all Class members and subject matter jurisdiction to enter this Final Order and Judgment. Without in any way affecting the finality of this Final Order and Judgment, this Court hereby retains jurisdiction as to all matters relating to administration, consummation, enforcement and interpretation of the Settlement Agreement and of this Final Order and Judgment (including, without limitation, the Release and the permanent injunction described *supra,* ¶ 10), and for any other necessary purpose.

14. Neither this Final Order and Judgment nor the Settlement Agreement (nor any document referred to herein or any action taken to carry out this Final Order and Judgment) is, may be construed as, or may be used as an admission or concession by or against Allmerica or the other Releasees (as that term is defined in the Release) of the validity of any claim or any actual or potential fault, wrongdoing or liability whatsoever. Entering into or carrying out the Settlement Agreement (including the exhibits therein), and any negotiations or proceedings related therein shall not in any event be construed as, or deemed to be evidence of, an admission or concession with regard to the denials or defenses by Allmerica and shall not be offered or received in evidence in any action or proceeding against Allmerica or the other Releasees hereto in any court, administrative agency or other tribunal for any purpose whatsoever other than as evidence of the settlement or to enforce the provisions of this Final Order and Judgment and the Settlement Agreement; *provided, however,* that this Final Order and Judgment and the Settlement Agreement may be filed in any action against or by Allmerica or the other Releasees to support a defense of *res judicata,* collateral estoppel, release, good faith settlement, judgment bar, reduction or any theory of claim preclusion or issue preclusion or similar defense or counterclaim.

15. This Action, including all individual claims and Class claims resolved herein, is hereby dismissed on the merits and with prejudice against the plaintiffs and all other Class members, without fees or costs to any party except as otherwise ordered by the Court.

**So ordered.**

## EXHIBIT A

### RELEASE

*Release and Waiver.* Plaintiffs and all Class Members shall agree to a release and waiver as follows:

A. *Definitions.* For purposes of this release and waiver ("Release"):

(1) The term "Policies" means all Whole Life, universal life, or variable universal life insurance policies issued by the Company during the period

from January 1, 1978, through May 31, 1998, including any paid-up additions or other riders or amendments to such policies, but not including any such policies with respect to which the owner has timely requested exclusion from the Class.

(2) The term "Releasees" means the Defendants, their past, present and future parents, subsidiaries, affiliates, predecessors, successors and assigns, and each of their respective past, present and future officers, directors, employees, general agents, agents, producers, brokers, solicitors, representatives, attorneys, heirs, administrators, executors, insurers, predecessors, successors and assigns, or any of them, including any person or entity acting on the behalf or direction of any of them.

(3) The term "Investment Plan" means a pension or retirement plan, investment or savings account, tuition or college-funding or mortgage-protection plan or other type of investment, savings or thrift vehicle.

(4) The term "Released Transactions" means (a) the marketing, solicitation, application, underwriting, acceptance, sale, purchase, operation, performance, retention, administration, servicing or replacement (by means of loans or withdrawal of values from, or surrender, partial surrender, and/or termination of, any life insurance policy) of the Policies or (b) the replacement (by means of loans or withdrawal of values from, or surrender, partial surrender, and/or termination of, any life insurance policy) with a Policy or any policy, annuity or mutual fund issued by the Releasees or by another company. Such term shall include, without limitation, the matters described in Section B of this Release.

(5) The term "Vanishing Premium" (including "Quik Pay") means (a) a concept under which an insurance poli-

cy's premiums or charges may be paid out of its then-current and anticipated accumulated values, or cash values or dividends, as those charges or premiums become due, (b) a concept under which a single out-of-pocket premium payment or a fixed number of out-of-pocket premium payments—based on nonguaranteed interest crediting rates, dividends and/or policy charges—may suffice to cover all policy premiums and/or charges and may keep coverage in force throughout the insured's life, or for a specified period, without reducing the policy's death benefits at all or beyond a fixed amount, or (c) use of this term or the terms "paid up" or "fully paid up" or similar terms in connection with the sale of a Policy.

B. *Release*

(1) Plaintiffs and all Class Members hereby expressly agree that they shall release and discharge the Releasees from, and shall not now or hereafter institute, maintain or assert against the Releasees, either directly or indirectly, derivatively, on their own behalf, on behalf of the Class or any other person or entity any and all causes of action, claims, damages, equitable, legal and administrative relief, interest, demands or rights, of any kind or nature whatsoever, including, without limitation, claims for all damages of any kind, including compensatory, punitive, consequential and those in excess of actual damages, claims for legal fees and claims for mental anguish, whether based on federal, state or local law, statute, ordinance, regulation, contract, common law, or any other source, that have been, could have been, may be or could be alleged or asserted now or in the future by Plaintiffs or any Class Member (including, without limita-

tion, their successors and assigns, beneficiaries, officers, directors, employees, agents, solicitors, representatives, attorneys, heirs, administrators, executors, insurers, and any person or entity acting on the behalf or direction of any of them) against the Releasees or any of them in the Action or in any other court action or before any regulatory or administrative body (including any state Department of Insurance, self-regulatory or other regulatory entity or organization), tribunal, arbitration panel, or other adjudicatory body on the basis of, connected with, arising out of, or related to, in whole or in part, the Policies, the Released Transactions and servicing relating to the Released Transactions or Policies, including without limitation:

(a) any or all of the acts, omissions, facts, matters, transactions, occurrences, or any oral or written statements or representations that were directly or indirectly alleged, asserted, described, set forth or referred to in the Action;

(b) any or all of the acts, omissions, facts, matters, transactions, occurrences, or any oral or written statements or representations allegedly made in connection with or directly or indirectly relating to the Released Transactions, including without limitation any acts, omissions, facts, matters, transactions, occurrences, or oral or written statements or representations relating to:

(i) the Vanishing Premium concept;

(ii) the number of out-of-pocket payments that would need to be paid for a life insurance policy or the Policies;

(iii) the ability to keep or not to keep the Policy; or the Policies In–Force based on a fixed number and/or amount of premium payments (less than the number and/or amount of payments required by the terms of the Policies), and/or the amount that would be realized or paid under the Policies based on a fixed number and/or amount of cash payments (less than the number and/or amount of payments required by the terms of the Policies), whether in the form of *(i)* cash value and/or *(ii)* death, retirement or periodic payment benefits, and/or *(iii)* Investment Plan-type benefits;

(iv) The number of premium payments that would be sufficient to maintain certain levels of coverage;

(v) the dividends credited or to be credited to the Policies, including the manner of determination of the amounts of dividends and the allocation of dividends among the Policies and the application of dividends to any Policy;

(vi) the interest rate credited or to be credited to premiums paid on the Policy or the Policies, or to amounts within the Policy or Policies, and the deductions (including all expense and other deductions) charged or to be charged against the Policy or Policies;

(vii) the nature, characteristics, terms, descriptions, operation or relative appropriateness or suitability, of the Policies;

(viii) the fact that the Policies were or were not life insurance or that Plaintiffs' or Class Members' objectives (and/or the fact that the purchaser's goals) would be funded by the cash values and/or benefits derived from a life insurance policy or that the product being sold was life insurance was minimized or disguised;

(ix) whether the Policy or Policies were, would operate or could function as an Investment Plan as defined in Exhibit A to the Stipulation;

(x) the relationship between the Policy's or Policies' cash surrender value and the cumulative amount of premiums paid;

(xi) whether a part of the premiums paid would not be credited toward an investment or savings account or the Policy's or Policies' cash accumulation value, but would be used to offset ·Defendants' commission, sales, administration, tax and/or mortality expenses;

(xii) the rate of return on premiums paid in terms of cash value or cash surrender value;

(xiii) the use of an existing policy's or annuity's or mutual fund's, dividend's or cash value or cash surrender value or other values by means of a surrender, withdrawal/partial surrender or loan to purchase or maintain a new Policy;

(xiv) the replacement or rollover of an existing life insurance policy or Policy with or into a new Policy;

(xv) violations of the "twisting" or "churning" or replacement statutes or regulations under applicable state law;

(xvi) the Defendants' dividend, account value, interest crediting, cost of insurance and administrative charge, and direct recognition policies and practices; policy or premium charges and monthly deductions, including the attribution to the Policy of any taxes imposed on the Company; illustrations of interest crediting rates, account equity rates, account value calculations, policy charges, premium charges, monthly deductions, cost of insurance and administrative charges, cash values or death benefits; or any other matters relating to dividends, interest crediting rates, account equity rates, account value calculations, policy charges, premium charges, monthly deductions or

cost of insurance and administrative charges;

(xvii) the adequacy of the disclosure regarding those items in B(1)(a) through B(1)(b)(xx);

(xviii) the operation, administration, appropriateness and/or performance of accounts which were available or were selected as options within variable universal life Policies;

(xix) any actual or alleged violation of any federal or state statute or federal or state regulation or rule or self-regulatory organization rule relating to life insurance sales practices;

(xx) the manner in which the Defendants trained or supervised any of the Releasees; and/or

(c) any or all acts, omissions, facts, matters, transactions, occurrences or oral or written statements or representations in connection with or directly or indirectly relating to the Settlement Agreement or the settlement of the Action, except as set forth in the proviso of part B(5) below.

(2) Nothing in this Release shall be deemed to alter *(i)* a Class Member's contractual rights (except to the extent that such rights are altered or affected by the election and award of benefits under the Settlement Agreement) to make a claim for benefits that will become payable in the future pursuant to the express terms of the policy form issued by any of the Defendants or *(ii)* a Class Member's right to assert any claim which arises in its entirety from facts and circumstances arising after the date on which notice of the settlement is first mailed to Class Members; *provided, however,* that this provision shall not entitle a Class Member to assert claims which relate to the allegations contained in

the Action or to the matters described in part B(1), above.

(3) Without in any way limiting the scope of the Release, this Release covers, without limitation, any and all claims for attorneys' fees, costs or disbursements incurred by Lead Counsel or any other counsel representing Plaintiffs or Class Members, or by Plaintiffs or the Class Members, or any of them, in connection with or related in any manner to the Action, the settlement of the Action, the administration of such settlement and/or the Released Transactions except to the extent otherwise specified in the Settlement Agreement.

(4) Plaintiffs and the Class Members expressly understand that certain principles of law, such as Section 1542 of the Civil Code of the State of California, provide that a general release does not extend to claims which a creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor. To the extent that, notwithstanding the choice of law provisions in the Settlement Agreement, California or other law may be applicable, Plaintiffs and the Class Members hereby agree that the provisions of Section 1542 and all similar federal or state laws, rights, rules, or legal principles of any other jurisdiction which may be applicable herein, are hereby knowingly and voluntarily waived and relinquished by Plaintiffs and the Class Members, and Plaintiffs and the Class Members hereby agree and acknowledge that this is an essential term of this Release.

(5) In connection with this Release, Plaintiffs and the Class Members acknowledge that they are aware that they may hereafter discover claims presently unknown or unsuspected, or facts in addition to or different from those which they now know or believe to be true with respect to the matters released herein. Nevertheless, it is the intention of Plaintiffs and the Class Members in executing this Release fully, finally and forever to settle and release all such matters, and all claims relating thereto, which exist, hereafter may exist, or might have existed (whether or not previously or currently asserted in any Action); *provided, however,* that nothing in this Release shall prevent a Class Member who discovers after the first mailing of notice of the settlement to the Class Members facts that arise out of or relate to the servicing of a Policy after its purchase (not including the matters described above in part B(1)) and that could not have been known with the exercise of reasonable care as of the date when notice of the settlement is first mailed to Class Members from submitting a claim based on such facts to the Alternative Dispute Resolution Process for resolution under Part 8 of Exhibit A to the Settlement Agreement.

(6) Nothing in this Release shall preclude any action to enforce the terms of the Settlement Agreement, including participation in any of the processes detailed therein.